JUDGE COTE

14 CV 1085

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH BILINSKI, GEORGE LATHOURAS, LISA CUBISINO, JACQUELINE PETRUZZELLI, ANTHONY PETRUZZELLI, ARTHUR CANARIO, GERALDINE BIEHL, JESUS RAMOS, and LUCAS SCHOORMANS, <br><br> Plaintiffs, <br><br> -against- <br><br> THE KEITH HARING FOUNDATION, INC., THE ESTATE OF KEITH HARING, JULIA GRUEN, KRISTEN HARING, GILBERT VAZQUEZ, ALLEN HARING, TOM ECCLES, DAVID STARK, and JUDITH COX, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT** <br><br>  |

Plaintiffs, by their attorneys, allege the following upon knowledge as to their own acts and upon information and belief as to all other matters:

## INTRODUCTION

1.      This is an action for damages by Plaintiffs against The Keith Haring Foundation, Inc. ("Foundation"), its members, and The Estate of Keith Haring ("Estate") for wrongfully destroying the value of a series of paintings created by the deceased artist Keith Haring ("Haring Works"). (A reproduction of the Haring Works is attached hereto as Exhibit A.) As set forth in detail below, Defendants publicly labeled the Haring Works as "counterfeit" and "fake" even though they repeatedly ignored and failed to review the information provided by Plaintiffs that establishes the provenance of the works and, as with any artwork, is critical to their authentication.

2.     Haring was an influential artist and social activist of the late 20th century. His work responded to the New York City street culture of the 1980s by expressing concepts of birth, death, sexuality, and war. Throughout his career, Haring devoted much of his time to public works with clear social messages concerning subjects like drug addiction and AIDS. As a result, his work was often heavily political and his imagery has become a widely recognized visual language of the 20th century.

3.     Since his untimely death in 1990, Haring has been the subject of several international retrospectives. His art was the subject of a 1997 retrospective at the Whitney Museum in New York. In 1996, a retrospective at the Museum of Contemporary Art Australia was the first major exhibition of his work in Australia. In 2008, there was a retrospective exhibition at the Musée d'art contemporain ("MAC") in Lyon, France. In February 2010, on occasion of the 20th anniversary of the artist's death, the Tony Shafrazi Gallery showed an exhibition containing dozens of works from every stage of Haring's mature work. In March 2012, a retrospective exhibit of Haring's work, *Keith Haring: 1978-1982*, opened at the Brooklyn Museum in New York. And in April 2013, *Keith Haring: The Political Line* opened at the Musee d'Art Moderne de la Ville de Paris and Le Centquatre.

4.     For many years, the Foundation operated an authentication committee that accepted applications for review of artworks attributed to Haring. The committee made its decisions in secret, with little or no explanation, and often without ever physically inspecting the works. Indeed, in many cases, no inspection was performed because the works were being rejected for reasons entirely unrelated to their authenticity.

5.     In 2007, Defendants agreed to review Plaintiffs' application that Defendants authenticate certain of the Haring Works. Defendants denied the authenticity of the works based

on their review of a single photographic transparency of each work. Defendant Julia Gruen, an authorized representative of the Foundation and the Estate, told Plaintiffs, however, that Defendants' opinion "may change by reason of circumstances arising or discovered" after the date of the opinion. In reliance on this statement (and others), Plaintiffs expended significant time and resources, over the course of many years, obtaining additional information establishing the provenance of the Haring Works. However, the Foundation and the authentication committee members ignored and failed to review the information provided by Plaintiffs. Instead, Defendants arbitrarily refused to consider the information, or to express an opinion on the authenticity of the Haring Works, even though an artwork owned by the late Dennis Hopper, with provenance similar to the Haring Works, was authenticated by the Foundation following the actor's death in May 2010.

6.    An authentic Haring artwork can be worth millions of dollars in today's art market. However, without a certificate of authenticity from the Foundation (or at least its tacit approval), no major auction house is willing to sell a Haring artwork. Moreover, by rejecting authentic Haring artworks, the Foundation has inflated the value of works owned by the Foundation and its representatives, all of which bear the Foundation's certificate of approval. In fact, in just the years 2008 through 2011, the Foundation sold more than $4.5 million of Haring artworks that it owns. The Foundation has also used its authentication powers to carefully cultivate Haring's image and obscure important facts about his working methods (i.e., uncredited collaboration with other artists) and his personal narrative, which has benefited the Foundation and its representatives.

7.    In September 2012, following years of litigation against other similarly constructed authentication committees in which art owners challenged their arbitrary and

improper decisions, the Foundation announced it was dissolving its own authentication committee. Despite the committee's dissolution, however, the Foundation has continued its aggressive tactics by other means.

8.      Plaintiffs are the victims of these malicious and wrongful tactics. Beginning on March 6, 2013, the Haring Works were featured in an art show titled "Haring Miami" and held at the Moore Building in Miami, Florida. On March 8, 2013, however, the Foundation filed a lawsuit against the organizers of Haring Miami seeking an injunction on the basis that the Haring Works on display were "fakes," "forgeries," and "counterfeits." Defendants also issued a press release falsely describing the Haring Works as "fakes," and maliciously accusing Plaintiffs of "suspected fraud." Defendants' press release and the federal complaint referenced therein also falsely accused Plaintiffs of attempting to pass off works rejected by the Foundation as authentic Harings.

9.      Defendants' public assertions that the Haring Works are "fake" and "counterfeit," combined with their arbitrary refusal to consider information presented to them establishing the provenance of the Haring Works, have cost Plaintiffs millions of dollars. In fact, Defendants admitted in their Miami lawsuit that "[e]ach of these works of art, if they were real Haring works, would be worth in the range of $500,000 to $1 million dollars." Moreover, because of Defendants' defamatory press release, as well as associated documents including the equally false and malicious federal complaint referenced therein, Plaintiffs suffered damage to their respective reputations. Defendants are thus liable to Plaintiffs for substantial damages for their wrongful and tortious conduct.

## PARTIES

10.     Plaintiffs Bilinski, Lathouras, Cubisino, J. Petruzzelli, A. Petruzzelli, Canario, Biehl, Ramos, and Schoormans are owners or joint owners of the various works identified on Exhibit A.

11.     Defendant the Foundation is a New York not-for-profit corporation with its principal place of business at 676 Broadway, New York, NY 10012. The Internal Revenue Service treats the Foundation as a "Private Foundation."

12.     Defendant the Estate is located in New York, NY.

13.     Defendant Julia Gruen is an individual residing in New York and Executive Director of the Foundation.

14.     Defendant Kristen Haring is an individual residing in New York and a Director of the Foundation.

15.     Defendant Gilbert Vazquez is an individual residing in New York and Vice President of the Foundation.

16.     Defendant Allen Haring is an individual residing in New York and Treasurer of the Foundation.

17.     Defendant Tom Eccles is an individual residing in New York and a Director of the Foundation.

18.     Defendant David Stark is an individual residing in New York and Secretary of the Foundation.

19.     Defendant Judith Cox is an individual residing in New York and a Director of the Foundation.

## VENUE AND JURISDICTION

20.    Venue lies in this District pursuant to 28 U.S.C. §1391(a) and (b).

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because Plaintiffs' Lanham Act claim arises under 15 U.S.C. § 1125(a).

22.    Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider claims arising under state law.

## FACTUAL ALLEGATIONS

### Background of the Artist

23.    Haring initially achieved public attention with artworks in subways, which were his first recognized pieces of pop art. These exhibitions were filmed by the photographer Tseng Kwong Chi, who also took thousands of photographs of Haring throughout the 1980s working on murals, installations, and the subway. In 1984, Tseng's photographs were shown with Haring's work at the opening of the Semaphore Gallery's East Village location in a show titled "Art in Transit."

24.    Starting in 1980, Haring organized exhibitions in Club 57. In June 1980, he participated in the "Times Square Show" (a mass exhibition with over 100 artists) and drew, for the first time, animals and human faces. That same year, he photocopied and pasted around New York City provocative collages made from cut-up and recombined headlines from THE NEW YORK POST. In 1981, he sketched his first chalk drawings on black paper and painted plastic, metal, and found objects.

25.    Between 1982 and 1989, Haring produced more than 50 public artworks around the world, many of them for charities, hospitals, children's day care centers, and orphanages. The now famous "*Crack is Wack*" mural of 1986 has become a landmark along New York City's

FDR Drive. Other projects include: a mural created in 1986 for the 100th anniversary of the Statue of Liberty that Haring created with 900 children; a mural on the exterior of Necker Children's Hospital in Paris, France in 1987; and a mural painted on the Berlin Wall three years before its fall. Haring also held drawing workshops for children in schools and museums in New York, Amsterdam, London, Tokyo, and Bordeaux, and produced imagery for many literacy programs and other public service campaigns. Haring was such a prolific public artist that new works are still being discovered decades after his death. In December 2007, for example, an area of the American Textile Building in the TriBeCa neighborhood of New York City was discovered to contain a painting of Haring's from 1979.

26.    By 1982, Haring had established friendships with fellow emerging artists like Futura 2000, Kenny Scharf, Madonna, and Jean-Michel Basquiat. During the 1980s, Haring further became acquainted with Andy Warhol, who was the theme of several of his pieces including "Andy Mouse." Haring's friendship with Warhol would prove to be an important element in his eventual success. In 1986, Haring opened his famous downtown Pop Shop with Warhol's backing.

**The Haring Foundation**

27.    Haring started the Foundation in 1989, shortly before his death, to ensure that his philanthropic legacy would continue indefinitely. Since then, the Foundation has been charged with fulfilling various directives in Haring's will. These include:

(a)    to administer and distribute funds to aid organizations, institutions, and individuals that engage in charitable and educational activities, especially those that assist and protect young children and encourage them in developing their full potential, as well as organizations involved in research, care, and activities related to AIDS;

(b)     to distribute property and grants to institutions, such as museums or schools that exhibit and/or make art works created by Haring available for viewing and study by art historical scholars and/or by the general public; and

(c)     to perpetuate the understanding of works created by Haring, through publication of reproductions of Haring's writings, drawings, paintings, or other works in the form of books, films, or video tape.

28.     Haring's will also specifically directed the Foundation to make distributions of its earned income as follows: 25% to The Children's Village of Dobbs Ferry, New York, and 25% to the Boys Club of the Lower East Side of New York City. While the Foundation has stated that it makes grants to a variety of not-for-profit groups that engage in the aforementioned charitable and educational activities (including the Children's Village and Boys Club), it has distributed only a relatively small percentage of its gross income in recent years. For example, in 2007 and 2008, the Foundation distributed only 5% and 2% of its gross income, respectively.

29.     One of the ways that the Foundation earns income is by selling Haring works. Other than a few specifically identified pieces in his will, Haring bequeathed the entirety of his works to the Foundation, which has maintained a collection of Haring art since his death. Between 2008 and 2011, the Foundation has sold millions of dollars of these Haring artworks. For example:

| Year | Gross Artwork Sales |
|------|---------------------|
| 2011 | $2,009,003 |
| 2010 | $1,524,513 |
| 2009 | $ 940,646 |
| 2008 | $ 124,525 |
| Total | $4,598,687 |

30.    The Foundation has also received millions of dollars from lucrative licensing and royalty agreements since Haring's death. In fact, according to a recent FORBES article (*"Earnings From the Crypt,"* dated Feb. 28, 2001), Haring has been one of the highest paid deceased celebrities:

| Rank | Name | 2000 Earnings |
|------|------|---------------|
| 1 | Elvis Presley | $35 million |
| 2 | Charles Schulz | $20 million plus |
| 3 | John Lennon | $20 million |
| 4 | Theodor "Dr. Seuss" Geisel | $17 million |
| 5 | Jimi Hendrix | $10 million plus |
| 6 | Bob Marley | $10 million |
| 7 | Andy Warhol | $8 million |
| 8 | J.R.R. Tolkien | $7 million |
| 9 | Frank Sinatra | $6 million |
| 10 | Jerry Garcia | $5 million |
| *11* | ***Keith Haring*** | ***$4 million plus*** |
| 12 | Marilyn Monroe | $4 million |
| 13 | James Dean | $3 million |

31.    The FORBES article goes on to explain that in 2000, "Haring sold $2 million worth of collectibles alone, surpassing the $1.5 million worth of limited edition Haring artwork the foundation sold." However, the Foundation's IRS Form 990-PF for that year ("Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation") does not reflect any royalty income for 2000 – or any year for that matter until 2008:

| Year | Royalty Income |
|------|----------------|
| 2011 | $1,141,390 |
| 2010 | $1,069,593 |
| 2009 | $1,161,261 |
| 2008 | $840,002 |
| 2007 | $0 |
| 2006 | $0 |
| 2005 | $0 |
| 2004 | $0 |
| 2003 | $0 |
| 2002 | $0 |

2001        $0
2000        $0

32.     The lack of any reported royalty income until 2008 appears to be inconsistent with Haring's will, which bequeaths to the Foundation his works of art, as well as "any copyrights relating thereto" and "trademarks."

**The Authentication Committee**

33.     The Foundation has never published a definitive catalogue raisonné of Haring's works. Until recently, the Foundation maintained an authentication committee that accepted applications for review of artworks attributed to Haring. In or about September 2012, however, Defendant Gruen announced that the authentication committee was being dissolved and no new applications for review would be accepted.

34.     According to a press release dated September 14, 2012, the decision to dissolve the committee was purportedly made to better serve the public and the Foundation's charitable mission by redirecting resources to purposes more directly related to the charitable goals designated by the Foundation's founder (i.e., Haring). In reality, however, the dissolution of the authentication committee makes it easier for Defendants to evade liability for the committee's improper denials of authentic Haring artworks.

35.     The principal effect of this dissolution has been to inflate the value of any works with a certificate of authenticity from the Foundation. As Gracie Mansion, a senior specialist at Artnet Auctions, explains: "It leaves a lot of work out there that people don't know is authentic or not. Works with certificates from the foundation, which is probably a small percentage, will be more valuable, as will works that have been in catalogues or museum shows."

36.     Major auction houses like Sotheby's claim to require such a certificate as a condition of sale. According to Miety Heiden, head of contemporary private sales at Sotheby's

North America: "If people come to us with a work without a certificate, we won't sell it." In reality, most will still sell artwork by Haring that has not been certified as long as the Foundation tacitly approves. For example, upon information and belief, Christie's held an auction of such uncertified works tacitly approved by the Foundation in August 2013.

37.     It is also possible to sell uncertified works privately where buyers are confident of their authenticity. But such sales occur at substantially lower prices because the submarket for these authentic but uncertified Haring artworks has been artificially depressed. Moreover, as the events that gave rise to this litigation show, the specter remains that the Foundation will interfere with the sale of Haring works that have not been certified despite its claim to be out of the business of authentication.

**The Haring Works**

38.     Plaintiffs are a group of art collectors. Over the years, they have collectively assembled an impressive and diverse collection of artworks – including the Haring Works. Plaintiffs began purchasing the Haring Works in 2007 (directly and indirectly) from two friends of Keith Haring: Angelo Marino and Delta Cortez (also known as Delta Dos or Delta 2).

39.     Angelo Moreno was a DJ at a club called The Inferno (West 19th Street in New York City) in 1982 when he was introduced to Haring by their mutual friend, Larry Levan (who was a DJ at another club). Moreno and Haring attended numerous parties and social events together, often doing drugs such as cocaine, crack, and Quaaludes.

40.     It is indisputable that Haring and Moreno knew each other and were close. There are numerous pictures of the two of them together and letters from Haring to Moreno. In one such letter, Haring describes Moreno as "'sweet' physically [and] 'inside,'" and states "I always feel comfortable around you and appreciated your friendship."

41.     The two eventually became lovers. In fact, Moreno has stated that he believes he contracted HIV from Haring over the course of their relationship.

42.     From approximately 1982-83, Moreno spent a great deal of time with Haring, observing him paint at his studio, in public, and at Moreno's apartment. During the 1980s, Moreno obtained numerous artworks from Haring, including the Haring Works.

43.     Cortez first became aware of Haring in 1979 when the two were graffiti artists leaving their respective tags throughout the New York City subway system. It was through their connections (like Patti Astor of FUN Gallery in Soho) that Cortez eventually met Haring and became friends. In or about 1984, the two collaborated with several other up-and-coming artists on the immensely successful Basel Art Fair at the La Placa Gallery on Varick Street.

44.     In the years that followed, Cortez saw Haring socially on at least ten different occasions, including in 1985 and again in 1987. In 1990, shortly before his death, Haring visited Cortez a final time at Water the Bush, the Los Angeles nightclub where Cortez was working as artistic director. The two affirmed their friendship.

45.     Moreno and Cortez first met back in 1982, at the Paradise Garage nightclub in New York. The two next crossed paths at a New York nightclub in 1986, then again at a Manhattan flea market in 1991.

46.     In or about 1997, Cortez became acquainted with Jesus Ramos ("Ramos") who was working at an antique furniture store on the Lower East Side of Manhattan. The two would often talk painting and art.

47.     In 1999, Moreno and Cortez once again ran into each other at another flea market at 26th Street and 5th Avenue in Manhattan. Moreno mentioned to Cortez that Haring had left him a number of artworks. Cortez was intrigued and inquired whether certain specific artworks

were among them as they might be saleable. Moreno replied that he believed they were but that he could not recall where he had stored those specific works. Moreno promised he would look for them and report back to Cortez.

48.     Approximately four months later, Moreno telephoned Cortez with news he had found the requested artworks. Moreno proposed that, if Cortez could sell the artworks, Moreno would pay him a percentage of the proceeds. Cortez agreed and the two began selling the Haring artworks Moreno owned to various galleries and collectors.

49.     One such buyer was Ramos, who purchased artworks, initially by himself for resale, then later on behalf of others such as Bilinski, who provided the money to purchase the artworks. Cortez explained the artworks were from Moreno, and showed Ramos pictures of Moreno with Haring, but Moreno never personally met or dealt with Ramos directly. Ramos purchased numerous artworks from Moreno and Cortez in this fashion.

50.     Many of these buyers wanted paperwork certifying the artworks as authentic, which Moreno was unable to provide. Cortez contacted the Foundation in hopes of obtaining such paperwork for some of the artworks in Moreno's possession. A representative of the Foundation eventually returned his calls and expressed a strong interest in the artworks Cortez had mentioned and requested pictures and descriptions of the artworks.

51.     Cortez approached Moreno with this news and argued the artworks would fetch an even higher price if they were authenticated by the Foundation. Moreno was reluctant, believing the Foundation to be controlled by crooks. But Cortez was insistent about continuing to communicate with the Foundation.

52.     Eventually, Cortez was contacted by the Foundation and informed that, if he wished to sell the artworks in question, the Foundation would be willing to authenticate one or

two of the pieces so long as he agreed to give the Foundation ten of the pieces. After inquiring with his contacts in the art community, Cortez concluded it would be better not to pursue authentication from the Foundation at that time.

53.     In or about 2006, however, Cortez again approached the Foundation about obtaining the proper paperwork for the same artworks. At that time, Cortez was informed in a phone conversation that the Foundation was not certifying artworks like the ones he wished to submit. Further conversations and inquiries proved fruitless.

**The Haring Works**

54.     The Haring Works are a collection of artworks created by Keith Haring. They are described in detail in Exhibit A.

55.     In or about January 2007, Bilinski showed the collection to Lucas Schoormans, a respected dealer and gallery owner who worked as Larry Gagosian's right-hand man during the period when Haring first became commercially popular. Bilinski carefully researched Schoormans' reputation prior to meeting with him, speaking with knowledgeable figures in the art world like Tony Shafrazi, all of whom spoke highly of Schoormans.

56.     Schoormans studied the Haring Works closely and was so convinced of their authenticity that he purchased several pieces of his own from among the Haring Works.

57.     Schoormans persuaded Bilinski it was standard operating procedure, and in their best interests as owners, to have the Haring Works formally authenticated by the Foundation.

58.     On or about March 28, 2007, Schoormans submitted photographic transparencies and letters of provenance from Cortez and Moreno for 13 of the Haring Works on behalf of Bilinski to the Haring authentication committee for review. Schoormans also submitted a letter from himself attesting to the Haring Works' provenance.

59.     On or about May 4, 2007, Schoormans submitted photographic transparencies and letters of provenance from Cortez and Moreno for 28 additional Haring Works on behalf of Bilinski to the Authentication Committee for review.

60.     On or about May 7, 2007, the Foundation rejected all 41 of the Haring Works submitted as "NOT AUTHENTIC" without any explanation. However, the Foundation's letters left the door open to revisiting these opinions, stating they could "change by reason of circumstances arising or discovered . . . after the date of this opinion."

61.     Determined to prove the Foundation wrong, and in reliance upon the Foundation's apparent willingness to revisit its judgments in light of further proof, Bilinski and Schoormans began researching and further documenting the provenance of the Haring Works.

62.     As part of this research, on or about October 24, 2007, Moreno signed a statement that Haring gifted him the artworks purchased by Bilinski via Ramos.

63.     Also as part of this research, on or about December 17, 2007, Moreno and Cortez were deposed by an attorney for Bilinski and Schoormans.

64.     Further, on or about January 11, 2008, Ramos was deposed by an attorney for Bilinski and Schoormans.

65.     During this same period, Mr. Schoormans made an appointment at Phillips auction house in hopes of obtaining their assistance in documenting the provenance of the Haring Works. His efforts, however, were similarly unsuccessful. While the Phillips representatives were impressed with the Haring Works, they were unwilling to do anything against the wishes of either the Foundation or Defendant Gruen.

66.     Shortly thereafter, and approximately one year after the Haring Works were denied, Bilinski received a letter dated May 8, 2008, from the Foundation's legal representative,

Eric R. Johnson of the law firm of Stout Thomas & Johnson. This letter falsely accused Bilinski of "selling" or making "available to sell items you are representing to be original works by Keith Haring when you have been duly warned they are not." The letter went on to threaten legal liability "for copyright infringement, trademark infringement and other claims," unless Bilinski immediately ceased and desisted any such activity.

67.    Bilinski's legal representative, Raymond J. Dowd of Dunnington, Bartholow & Miller, responded in a letter to Mr. Johnson dated May 12, 2008, stating Bilinski had "not sold or attempted to sell the works," and that they would "welcome an opportunity to discuss this matter with the Foundation." The letter further revealed Bilinski suffered from multiple sclerosis. Neither Mr. Johnson, nor anyone else from his law firm ever responded to this letter.

68.    After receipt of this letter, Schoormans telephoned Mr. Johnson in an effort to communicate further. However, Mr. Johnson refused to discuss the matter further and threatened to contact the Federal Bureau of Investigation about Bilinski.

69.    In or about December 2008, Bilinski and Schoormans enlisted Orion Analytical LLC ("Orion") to assist in conducting a forensic analysis of three of the Haring Works. Orion is a consulting firm that investigates the structure and chemical composition of materials comprising cultural property (e.g., paintings), forensic evidence, and manufactured goods. Orion's clientele includes art historians and conservators, auction houses and galleries, museums and non-profit institutions, attorneys and law enforcement agencies, collectors and Fortune 500 companies such as the Solomon R. Guggenheim Museum, Christie's, Sotheby's, the United States Department of Justice, and the Federal Bureau of Investigation. Orion assists these clients in ferreting out artistic forgeries.

70.     By letter dated December 28, 2008, Orion delivered its report on the three Haring Works. The Orion report provided details concerning the materials and craftsmanship, and provided objective points of comparison with other known Haring artworks.

71.     In or about the summer of 2010, Bilinski and Petruzzelli made an appointment at Sotheby's. There they spoke with Scott Nussbaum, a specialist in contemporary art. After inspecting the Haring Works and hearing the story, Nussbaum told them off the record that he believed the artworks were authentic but that he could do nothing to help them because of Julia Gruen.

72.     Thereafter, on or about May 26, 2010, Bilinski and Petruzzelli met with Ken Maxwell of Gagosian Gallery, who inspected six of the Haring Works at Artex, which is an art-storage facility in New York City. These six Haring Works included "Portrait on Radiant Baby, 1985" (Ex. A at No. 49) and "Heart" (Ex. A at No. 76).

73.     Maxwell was initially exuberant about the Haring Works, raving they were "incredible" and gushing that he was "looking at history." At the end of the meeting, Maxwell expressed a strong interest in helping Bilinski get the pieces authenticated. However, by the time Maxwell followed up by email, on or about June 3, 2010, he had cooled considerably. He expressed sympathy for Bilinski's situation, but explained that, "after conferring with a few people I have to take a step back." Upon information and belief, one of the people with whom Maxwell conferred was Defendant Gruen.

74.     In or about June 2010, Bilinski's representative telephoned Defendant Gruen's assistant to explain the situation and request advice about how best to approach the Foundation about reconsidering its judgment as to the Haring Works in light of new evidence. The assistant suggested they write a letter to Defendant Gruen – advice Plaintiffs took.

75.     Shortly thereafter, in or about July 2010, Bilinski's representative wrote the Foundation explaining that they had expended much time and money collecting new evidence of the Haring Works' authenticity, that they believed they now possessed the information necessary to complete the authentication process, and that they looked forward to setting up a meeting in person to resolve the situation.

76.     Defendant Gruen replied by email dated July 15, 2010, thanking Bilinski's representative for her letter and requesting that Bilinski's attorneys contact the Foundation's attorneys.

77.     Bilinski's representative responded by email dated July 19, 2010, requesting a brief telephone conversation with Gruen.

78.     In emails dated July 19 and 20, 2010, Gruen insisted that Bilinski provide a written Power of Attorney or notarized letter authorizing her representative to speak on her behalf. Bilinski's representative replied she would obtain the requested written authorization. But she balked at the Foundation's requirement they submit the rejected Haring Works via Bilinski's attorneys, noting those very same attorneys had advised them to do precisely the opposite. Gruen responded that they were required to proceed in this fashion because of Bilinski's supposed threats to sue and pursue criminal action against the Foundation. Bilinski's representative replied it was the Foundation that had threatened legal action.

79.     On January 24, 2011, Bilinski's representative emailed Gruen requesting confirmation the Foundation would not reconsider its judgment unless the Haring Works were submitted via Bilinski's attorneys. Bilinski's representative reiterated these same attorneys' recommendation not to do this.

80.     By email dated February 7, 2011, Gruen informed Bilinski's representative the Foundation would "not be revisiting our opinion on your works."

81.     Disturbed by this second unjustified denial, and the Foundation's complete unwillingness even to consider evidence it now knew existed confirming the Haring Works' authenticity, Bilinski and Schoormans sought still more evidence of the Haring Works' authenticity. In or about August 2012, they enlisted Art Access & Research (UK) Ltd. ("Art Access and Research") to conduct further forensic analysis of two of the Haring Works.

82.     In a report dated August 16, 2012, Dr. Nicholas Eastaugh of Art Access & Research, a leading expert in the scientific analysis of paintings, concluded:

> Two paintings on canvas, thought to be works by Keith Haring (1958-1990), were submitted for analysis of the materials. Painting A depicts two green men and a man in a car against a blue background; Painting B depicts two red men and an orange snake against a dark background. Both carry inscriptions on the reverse, one (B) incorporating the number '85'; presumably the date 1985.

> The primary question posed for the examination was to confirm whether or not the material composition of the paintings is consistent with the proposed attribution and dating by means of a study of their constituent pigments. Similarities between the works and a stated common origin allow us to consolidate the findings so that pigments found on one work may be used to infer the status of the other.

> In the present examination it has been demonstrated that the paintings could be considered as having been produced in the mid-1980s. No materials of undoubted introduction post-dating the death of Haring in 1990 were detected.

**Haring Miami**

83.     In early 2013, Plaintiffs agreed to participate in a show organized by Michael Rosen ("Rosen"), President of Colored Thumb Corp. ("Colored Thumb") featuring the Haring Works. The year prior, Rosen had organized a successful and lauded show in Miami featuring the art of Salvador Dali. Plaintiffs' participation in the show was arranged by The Weingrad

Group LLC, an art consulting group that helped produce the critically acclaimed documentary "Who The $%&* Is Jackson Pollock?"

84.     The show was titled "Haring Miami" and held at the Moore Building in Miami, Florida, from March 7-10, 2013. Opening night was a special VIP event held on or about, March 6, 2013. The guest of honor was Anthony Shriver, the noted disability advocate and founder of Best Buddies International ("Best Buddies"), a charity supporting children and adults with intellectual and developmental disabilities. The official logo of Best Buddies was created by Keith Haring. A portion of the proceeds from the show were earmarked for donation to Best Buddies and the HIV/AIDS awareness and treatment organization Care Resources.

85.     Unbeknownst to Plaintiffs or Haring Miami's organizers, Defendant Stark had crashed the party and was attempting to judge the authenticity of the paintings. His efforts were stymied by the dim lighting, the crowded launch party, and his inability to take any paintings off the wall for inspection. Instead, Stark was limited to taking photos of the works and managed to photograph around 40 before he was finally asked to leave.

86.     On March 8, 2013, the Foundation filed suit against Rosen and Colored Thumb in United States District Court for the Southern District of Florida, for willful trademark infringement, trademark dilution, copyright infringement, false advertising, cybersquatting, and false designation of origin under 15 U.S.C. §§ 1114, 1125(a); 1125(c), 17 U.S.C. § 101 et seq. ("Miami Complaint"). The Miami Complaint stated that "many works featured in Defendants' show that purport to be by Keith Haring were submitted to The Haring Foundation for authentication in 2007 by a collector named Liz Bilinski [and the] Haring Foundation advised Ms. Bilinski that the works were not authentic." Miami Complt. ¶14.

87.   Also on March 8, 2013, the Foundation made an emergency motion seeking a temporary restraining order against Rosen and Colored Thumb. The motion noted there was a "significant business in the production of fakes and forgeries, often promoted by 'pop up' exhibitions intended to defraud the public," and falsely asserted that Haring Miami "is one of these fraudulent 'pop up' exhibits." Motion at 1.

88.   The Foundation further issued a press release, also dated March 8, 2013, announcing the filing of the Miami Complaint and emergency motion, and celebrated the Foundation's supposed deterrence of "suspected fraud" ("March 8 Press Release"). The March 8 Press Release further described the Haring Works as "fake" – a statement that is false and particularly without basis given that the Foundation's original denial of authenticity was based only on a photographic transparency of the works, and Defendants (including Defendant Gruen) refused to consider the additional provenance information collected by Plaintiffs and offered to the Foundation on numerous occasions.

89.   As a result of Defendants' conduct, including their libelous public statements, the Haring Works were withdrawn from the Haring Miami show. Plaintiffs also failed to consummate planned sales to interested buyers.

90.   For example, Dr. Arthur Canario lost the sale of at least eight different works, belonging to him and to the collection, to a museum in London, England as a result of Defendants' tortious interference. Indeed, in an email dated March 10, 2013, a representative of the buyer specifically cited the allegations in the March 8 Press Release as the reason for backing out of this planned purchase.

91.   Plaintiffs repeatedly gave the Foundation opportunities to view the Haring Works, which it declined.

92.     The Foundation and its members never physically inspected the Haring Works – other than Defendant Stark's cursory review during the Haring Miami party, which, among other things, necessarily precluded him from inspecting the back of each work.

93.     Prior to issuing their defamatory statements, the Foundation and its members never reviewed the information collected by Plaintiffs regarding the provenance of the Haring Works.

94.     By Defendants' own admission in the Miami lawsuit: "Each of these works of art [in the Miami Show], if they were real Haring works, would be *worth in the range of $500,000 to $1 million dollars*." Miami Complt. ¶23 (emphasis added). Also by Defendants' own admission in the Miami lawsuit: "if the approximately 80 acrylic works on canvas in the show were real Harings, their collective value would be more than $40 million." *Id.* ¶24. Also by Defendants' own admission in the Miami lawsuit: "There is also a strong market for Keith Haring's original works, which sell for very significant sums (depending on the size of the work, the medium, and other factors)." *Id.* ¶2. Accordingly, the estimated fair market value of the Haring Works as authentic Harings is at least $40 million.

95.     To this date, Plaintiffs are unable to sell the Haring Works because, among other things, no auction house will sell the paintings as a Haring work given the Foundation's wrongful refusal to consider the authenticity of the Haring Works and their public declarations of the works as "fakes" and the result of "fraud." Thus, given the Foundation's misconduct, Plaintiffs have been substantially damaged in an amount not less than $40 million.

## FIRST CAUSE OF ACTION

### Defamation
### (Against All Defendants)

96.     Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

97.     Defendants, directly or through a spokesperson, employee, or agent, published or caused to be published a press release on or about March 8, 2013 that described the works in Exhibit A as "fake" and accused Plaintiffs of "suspected fraud."

98.     The March 8 Press Release specifically referred to the filing of the equally defamatory Miami Complaint, which falsely accused Plaintiffs (including Bilinski) of misrepresenting that the works in Exhibit A were painted by Haring when the Foundation had previously declared them not authentic.

99.     Plaintiffs (including Bilinski) are private individuals, not public figures.

100.    Defendants' statements are defamatory *per se* because they injure Plaintiffs' professional name and reputation by stating or implying that they are deceitful, unethical, and without integrity, and by falsely portraying Plaintiffs as guilty of a crime and unfit to sell artworks by Haring.

101.    Defendants published the false and defamatory statements with actual malice because they either knew the statements were false or published them with a reckless disregard for their truth or falsity. At a minimum, Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

102.    Defendants were motivated by hatred, personal spite, and/or ill will towards Plaintiffs, and Defendants maliciously published the statements with intent to harm Plaintiffs.

103.    Defendants intended and knew that their publication of the defamatory statements described above would be widely reported around the world, thereby causing additional harm to Plaintiffs with each republication.

104.    Defendants are not only liable for their own intentional conduct, but are also vicariously liable for the tortious acts of their employees or agents.

105.    In making these statements, Defendants were not protected by any privilege, whether qualified or absolute. Indeed, these statements were not simply opinions, but rather empirically verifiable statements of fact, as confirmed by the ample evidence of authenticity that Plaintiffs have amassed and are prepared to offer at trial, and which Defendants refused to review or consider.

106.    Additionally, Defendants made these statements either with a high degree of knowledge they were false, and/or with reckless disregard for the statements' truth or falsity, and/or in a grossly irresponsible manner, as evidenced by, among other things, the Foundation's utter refusal even to consider the copious evidence of Plaintiffs' artworks' authenticity despite Plaintiffs' repeated requests for them to do so.

107.    As a result of the defamatory statements described above, Plaintiffs have suffered (and continue to suffer) damages, including injury to their name, reputation, and financial interests.

108.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

109.    Additionally, Plaintiffs have suffered special damages in the form of lost sales of their Haring artworks in an amount not less than $8,000,000.

110.    Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Civil Conspiracy to Commit Defamation
### (Against All Defendants

111.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

112.    Defendants each entered into an agreement to unlawfully harm Plaintiffs by willfully and maliciously defaming Plaintiffs.

113.    Defendants each committed one or more overt acts pursuant to and in furtherance of their conspiracy to unlawfully harm and defame Plaintiffs.

114.    The defamatory statements in the First Cause of Action above are specifically incorporated herein by reference and made a part hereof.

115.    Defendants were motivated solely by hatred, personal spite or ill will towards Plaintiffs and maliciously published the statements with intent to harm. At a minimum, Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

116.    Defendants are not only liable for their own intentional conduct, but are also vicariously liable for the tortious acts of their employees or agents.

117.    As a result of the conduct described above, Plaintiffs have suffered (and continue to suffer) damages, including injury to their name, reputation, and financial interests.

118.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

119.    Additionally, Plaintiffs have suffered special damages in the form of lost sales of their Haring artworks in an amount not less than $8,000,000.

120.    Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**Tortious Interference with Prospective Business Relations**
**(Against All Defendants)**

121.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

122.    Defendants were aware of Plaintiffs' interest in selling their Haring artworks, as evidenced, *inter alia*, by Plaintiffs' repeated requests for the Foundation to reconsider its judgment that certain of their artworks were not authentic.

123.    In fact, Plaintiffs had several interested buyers for pieces from the works in Exhibit A, who were deterred by the Foundation's lawsuit. For example, Dr. Arthur Canario lost the sale of at least eight different pieces from among works in Exhibit A, belonging to him and to the collection, to a museum in London, England as a result of Defendants' tortious interference. Indeed, in an email dated March 10, 2013, a representative of the buyer specifically cited the false allegations in the March 8 Press Release as the reason for backing out of this planned purchase.

124.    Defendants' malicious filing of a false and defamatory complaint accusing Bilinski of misrepresenting the provenance of her artworks, followed by their equally malicious circulation of a false and defamatory press release referring to "suspected fraud," were independently tortious acts designed solely to interfere with and destroy Plaintiffs' prospective business relationships with these interested third-party buyers.

125.    At a minimum, Defendants acted with culpable recklessness or gross negligence by judging the works in Exhibit A on display at the Miami show as fakes on the basis only of a cursory examination, and by refusing to consider the substantial evidence collected by Plaintiffs of their artworks' authenticity.

126.    As a result of Defendants' improper actions, Plaintiffs have suffered (and continue to suffer) damages, including injury to their name, reputation, and financial interests, as well as lost sales of their artworks to interested third parties.

127.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

128.    Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### False Advertising Under the Lanham Act
### (Against All Defendants)

129.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

130.    Defendants have falsely advertised and publicized, and conspired to falsely advertise and publicize, the works in Exhibit A as not being authentic, falsely representing to the general public that the works in Exhibit A are "fake" and the result of "fraud."

131.    Defendants have also falsely advertised and publicized, and conspired to falsely advertise and publicize, that the works in Exhibit A are not authentic Haring artworks by failing to withdraw and counteract the adverse information that Defendants themselves disseminated to the marketplace.

132.   Defendants' false and misleading representations were unquestionably commercial in nature because they were published, disseminated, or otherwise communicated with the intent of preventing sales of the works in Exhibit A and of increasing the value of Defendants' artworks at their expense.

133.   In so doing, Defendants have made, or knowingly conspired and agreed to be made, false and misleading representations of fact in commercial promotions or advertising that misrepresent the nature, characteristics, qualities of geographic origin of Plaintiffs' goods, services, or commercial activities, all in violation of the Lanham Act, 15 U.S.C. § 1125(a).

134.   By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

## FIFTH CAUSE OF ACTION

### Trade Libel/Injurious Falsehood Under the Lanham Act
### (Against All Defendants)

135.   Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

136.   Defendants were aware of Plaintiffs' interest in selling the works in Exhibit A, as evidenced, among other things, by Plaintiffs' repeated requests for the Foundation to reconsider its judgment that certain of their artworks were not authentic.

137.   In fact, Plaintiffs had several interested buyers for pieces from the works in Exhibit A who were deterred by the Foundation's lawsuit. For example, Dr. Arthur Canario lost the sale of at least eight different pieces from among the works in Exhibit A, belonging to him and to the collection, to a museum in London, England as a result of Defendants' tortious interference. Indeed, in an email dated March 10, 2013, a representative of the buyer specifically

cited the false allegations in the March 8 Press Release as the reason for backing out of this planned purchase.

138.    Defendants' malicious publication of a defamatory March 8 Press Release that described the works in Exhibit A as "fake," as well as Defendants' equally malicious filing of the Miami Complaint, which falsely labeled the works in Exhibit A as not authentic, were calculated to prevent third parties from purchasing the works in Exhibit A from Plaintiffs, and to prevent Plaintiffs from selling the works in Exhibit A to third parties.

139.    Defendants' false statements played a material and substantial part in inducing these third parties not to deal with Plaintiffs with respect to the works in Exhibit A.

140.    Defendants' false statements and misrepresentations were published, disseminated, or otherwise communicated by Defendants across state borders and in interstate commerce.

141.    Defendants' false statements and misrepresentations were clearly commercial in nature because they were published, disseminated, or otherwise communicated with the intent of preventing sales of the works in Exhibit A and of increasing the value of Defendants' artworks at their expense.

142.    In so doing, Defendants have violated the Lanham Act, 15 U.S.C. § 1125(a).

143.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

## SIXTH CAUSE OF ACTION

### Intentional Infliction of Economic Harm
### (Against All Defendants)

144.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

145.    At all relevant times, Defendants were aware that a purpose in showing the works in Exhibit A at the Miami Show was to advertise the works to potential buyers.

146.    Defendants' malicious publication of a defamatory March 8 Press Release that described the works in Exhibit A as "fake," as well as Defendants' equally malicious filing of the Miami Complaint, which falsely labeled the works in Exhibit A as not authentic, were intended to inflict economic harm on Plaintiffs by preventing them from ever selling the works in Exhibit A, either at the Miami Show or at any time in the foreseeable future.

147.    Defendants' infliction of economic harm was motivated by malice and ill will toward Plaintiffs.

148.    Defendants' conduct was not excused or justified by any special circumstances recognized under law.

149.    Thus, to the extent Defendants' misconduct does not violate any other laws, or give rise to any other torts, they are still liable for the *prima facie* tort of intentional infliction of economic harm.

150.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

151.    Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

152.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

153.    The Foundation and its members are all dealers and/or collectors of works by Haring.

154.    The price of a work of art by a particular artist is driven in part by the quantity of work available by that artist. By refusing to authenticate the works in Exhibit A and publicly branding them as fakes, the Defendants have limited the number of Haring works in the public domain, thereby increasing the value of the Haring works that the Foundation and its members own or sell. Defendant Gruen has also knowingly benefited from Defendants' tortious misconduct through continued employment at the Foundation, collecting a generous six-figure salary worth $362,544 in 2011 alone.

155.    Additionally, the Foundation has been unjustly enriched by sales of Haring artworks that it owns at artificially inflated prices. In 2008-2011 alone, for example, the Foundation grossed more than $4.5 million in such inflated sales.

156.    The Foundation and its members, through their improper actions, have been unjustly enriched at the expense of Plaintiffs.

157.    Equity and good conscience dictate that Defendants should retain no part of the sums unjustly reaped as a result of their tortious misconduct.

158.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

159.    On the First Cause of Action against all Defendants, damages in an amount not less than $40,000,000, and special damages in an amount not less than $8,000,000.

160.    On the Second Cause of Action against all Defendants, damages in an amount not less than $40,000,000, and special damages in an amount not less than $8,000,000.

161.    On the Third Cause of Action against all Defendants, damages in an amount not less than $40,000,000.

162.    On the Fourth Cause of Action against all Defendants, damages in an amount not less than $40,000,000.

163.    On the Fifth Cause of Action against all Defendants, damages in an amount not less than $40,000,000.

164.    On the Sixth Cause of Action against all Defendants, damages in an amount not less than $40,000,000.

165.    On the Seventh Cause of Action against all Defendants, damages in an amount not less than $40,000,000.

166.    Plaintiffs seek compensatory and punitive damages from all Defendants.

167.    Decreeing that each of the Defendants violated the Lanham Act.

168.    Treble damages under the Lanham Act pursuant to 15 U.S.C. § 1117(a).

169.    Restitution to Plaintiffs in amount equivalent to Defendants' unjust enrichment.

170.    Appropriate punitive damages in an amount sufficient to punish Defendants for their gross misconduct and to set an example to deter others from similar misconduct.

171.    Attorneys' fees, pre- and post-judgment interest and costs of this action.

172.    Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial of all claims for relief that may be tried before a jury.

Dated: New York, New York
   February 21, 2014

BROWER PIVEN,
 A Professional Corporation

_____
Brian C. Kerr

David A.P. Brower
Brian C. Kerr
475 Park Avenue South, 33rd Floor
New York, NY 10016
Tel. (212) 501-9000
Fax (212) 501-0300

*Attorneys for Plaintiffs*

# EXHIBIT A

# EXHIBIT A

| No. | Image | Description | Medium | Dimensions |
|---|---|---|---|---|
| 1 |  | Baseball Mitt | acrylic and marker on leather baseball mitt | 11 x 7 x 3 inches |
| 2 |  | Stool | acrylic on metal stool | 12 x 14 1/8 x 14 1/8 inches |
| 3 |  | Pink Penis, Dancing Figure | acrylic on canvas | 40 x 30 inches |
| 4 |  | Blue Baby | acrylic on wood | 10 x 17 1/2 inches |
| 5 |  | Blue Rings Man, Pink Background | acrylic on board | 21 x 32 inches |
| 6 |  | Three Hands, Three Figures | acrylic on canvas | 26 x 36 inches |
| 7 |  | 3 Men, UFO | acrylic on canvas | 21 x 42 inches |

| No. | Image | Description | Medium | Dimensions |
|---|---|---|---|---|
| 8 | | Green R2D2 | acrylic on canvas | 42 x 31 inches |
| 9 | | Angel Winged TV | acrylic on canvas | 35 x 52 inches |
| 10 | | Blue/Red Winged Angel | acrylic on canvas | 52 1/4 x 48 inches |
| 11 | | Red Figure with Orange Rings/Twisting Figures | acrylic on canvas | 71 x 51 inches |
| 12 | | Blue Russian Doll Heads signed FUN Gallery | acrylic on tarp | 57 1/4 x 50 1/4 inches |
| 13 | | Radiant Baby | acrylic on tarp | 76 1/2 x 50 1/2 inches |
| 14 | | American Music Festival Print | cardboard | 11 5/8 x 18 1/2 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 15 |  | Red Snakes, Red Baby in Center | acrylic on canvas | 69 1/2 x 80 1/2 inches |
| 16 |  | Green Man Holding Red Baby | acrylic on canvas on stretcher | 40 1/4 x 30 inches |
| 17 |  | Mickey TV 2 | acrylic on canvas on stretcher | 28 x 34 inches |
| 18 |  | Blue/White Condom Man | acrylic on canvas on stretcher | 36 x 24 inches |
| 19 |  | Yellow/Red Bat Wing Men | acrylic on canvas | 70 x 73 inches |
| 20 |  | Green Twisted Man | acrylic on canvas | 58 1/2 x 39 1/4 inches |
| 21 |  | Blue Man on Yellow Dog | acrylic on canvas | 45 x 52 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 22 |  | Dancing Yellow Man, Blue Background | acrylic on canvas | 29 x 40 inches |
| 23 |  | Mickey TV, Two Blue Men | acrylic on canvas | 36 x 34 inches |
| 24 |  | Big Red Man with Tail holding Yellow Baby | acrylic on canvas | 69 x 72 inches |
| 25 |  | Red Siamese Men, Green Background | acrylic on canvas | 42 x 65 inches |
| 26 |  | Orange Face Blue Men and Dogs | acrylic on canvas | 39 x 61 inches |
| 27 |  | Three Men Green Snake | acrylic on canvas | 33 x 69 inches |
| 28 |  | Two Green Men, Red TV with Blue Baby | acrylic on canvas | 70 x 23 inches |
| 29 |  | Red Batman, Blue/Yellow and Green Men, Orange Background | acrylic on canvas | 70 x 75 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 30 |  | **Blue Bat with Red Wings** | acrylic on canvas on stretcher | 20 x 40 inches |
| 31 |  | **Dog Hatched, Red Baby Border** | acrylic on canvas | 16 x 12 inches |
| 32 |  | **Red Disco Man** | acrylic on canvas | 14 x 11 inches |
| 33 |  | **Red Man holding White Baby** | acrylic on canvas | 39 x 29 inches |
| 34 |  | **Red Dog DJ** | acrylic on canvas | 71 x 85 inches |
| 35 |  | **Orange Man holding Red Man** | acrylic on canvas | 68 x 53 1/2 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 36 |  | Blue Hatched Dancing Man and Baby, Green Background | acrylic on canvas | 48 x 71 inches |
| 37 |  | Orange Angry Angel, Turquoise Background | acrylic on canvas | 21 1/2 x 27 1/2 inches |
| 38 |  | White Dancing Man, Blue Background | acrylic on canvas on stretcher | 36 x 24 inches |
| 39 |  | Blue Reclining Man | acrylic on canvas on stretcher | 24 x 36 inches |
| 40 |  | Siamese Men Fighting | marker on board | 24 1/2 x 24 1/2 inches |
| 41 |  | Crosswalk Sign | marker on electric crosswalk sign | 18 x 18 x 10 inches |

| No. | Image | Description | Medium | Dimensions |
|---|---|---|---|---|
| 42 |  | Blue Orange Condom Man, Red Background | acrylic on canvas | 35 1/2 x 23 1/2 inches |
| 43 |  | TV Alien, 1984 | acrylic on canvas | 23 1/2 x 48 inches |
| 44 |  | Blue Man, Green Hands, signed Mary's LES, 1985 | acrylic on canvas | 29 x 44 inches |
| 45 |  | Green Red Yellow Stacked Men with Dogs, 1985 | acrylic on canvas | 73 3/4 x 70 1/2 inches |
| 46 |  | White Dog with UFOs, 1985 | acrylic on canvas | 81 1/4 x 70 1/2 inches |
| 47 |  | Two Red Babies, Green Crown Man, 1985 | acrylic on canvas on stretcher | 12 x 24 inches |
| 48 |  | Yellow/Red Hatched Dog, 1985 | acrylic on canvas on stretcher | 20 x 40 inches |
| 49 |  | Portrait on Radiant Baby, 1985 | acrylic on canvas | 29 3/4 x 39 3/4 inches |

| No. | Image | Description | Medium | Dimensions |
|---|---|---|---|---|
| 50 |  | UFO Batman, Blue Background, 1985 | acrylic on canvas | 20 x 23 inches |
| 51 |  | Green Barking Dog | acrylic on wood | 7 x 19 1/2 inches |
| 52 |  | Green Bending Figure with Green Dog | acrylic on canvas | 21 x 25 inches |
| 53 |  | Yellow Outlined Figure, Pink in Green Background | acrylic on canvas | 59 x 36 inches |
| 54 |  | Light Fixture | | 8 x 8 inches |
| 55 |  | Dancing Man, Dogs and Snakes | felt tip marker on leather "shield" | 16 x 10 inches |
| 56 |  | Computer Brain | acrylic on canvas | 39 1/2 x 30 inches |
| 57 |  | Green Men Skateboard | acrylic on canvas | 35 1/4 x 17 3/4 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 58 |  | Winged TV | acrylic on canvas | 64 x 76 inches |
| 59 |  | Blue Hand | acrylic on canvas | 80 x 80 inches |
| 60 |  | Pop Art-Red and Yellow Heart with Yellow Men | acrylic on canvas | 35 x 18 inches each |
| 61 |  | Black and Red | acrylic on canvas | 39 1/2 x 29 3/4 inches |
| 62 |  | Vase | acrylic and marker on vase | 14 x 7 x 7 inches |
| 63 |  | Green Self Portrait | acrylic on canvas | 48 x 36 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 64 |  | **Three Red Men Stacked with TV** | acrylic on canvas | 48 x 24 inches |
| 65 |  | **Orange Man Dog** | acrylic on canvas | 48 x 24 inches |
| 66 |  | **Radiant Babies around Green Baby** | acrylic on canvas | 30 x 40 inches |
| 67 |  | **Three Milk Glass Subway Tiles** | felt tip marker on subway tile | 6 x 3 inches each |
| 68 |  | **Mickey Mouse TV** | acrylic on canvas | 24 x 34 inches |

| No. | Image | Description | Medium | Dimensions |
|---|---|---|---|---|
| 69 |  | Vase 2 | acrylic and marker on vase | 12 1/4 x 7 1/2 x 7 1/2 inches |
| 70 |  | Red Telephone | marker on telephone | 8 1/2 x 8 1/2 x 6 inches |
| 71 |  | End Table | acrylic on end table | 20 x 14 x 14 inches |
| 72 |  | Blue Self-Portrait, 1984 | acrylic on canvas | 49 1/2 x 41 1/2 inches |
| 73 |  | Blue Twisted Men in Penis, 1985 | acrylic on canvas | 23 3/4  x 40 1/2 inches |
| 74 |  | Red Penis, 1985 | acrylic on canvas | 29 3/8 x 39 1/2 inches |
| 75 |  | Red and Yellow, 1985 | acrylic on canvas | 47 5/8 x 59 inches |

| No. | Image | Description | Medium | Dimensions |
|---|---|---|---|---|
| 76 |  | Heart, 1985 | acrylic on canvas | 37 1/2 x 70 1/2 inches |
| 77 |  | Blue Man, Red UFO, 1985 | acrylic on canvas | 36 x 24 inches |
| 78 |  | Black Telephone, 1985 | marker on telephone | 8 1/2 x 8 1/2 x 6 inches |
| 79 |  | Two Winged TVs, Two Red Dogs, Green Background | acrylic on canvas | 70 x 75 inches |
| 80 |  | Three Green Hands, Three Blue Men | acrylic on canvas | 65 x 31 inches |
| 81 |  | Three Dancing Men | acrylic on canvas | 33 x 57 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 82 |  | Three Men, Batman, Dog and TV | acrylic on canvas | 70 x 39 inches |
| 83 |  | Man on Dog | acrylic on canvas | 38 1/2 x 26 1/2 inches |
| 84 |  | Man on Dolphin | acrylic on canvas | 35 x 23 inches |
| 85 |  | Men with Angel Man | acrylic on canvas | 64 x 31 inches |
| 86 |  | Yellow Men, Blue Background | acrylic on canvas | 40 1/4 x 50 inches |
| 87 | | Mickey Mouse | acrylic on canvas | |
| 88 |  | Blue Men, Green Background | acrylic on canvas | 41 x 57 inches |

| No. | Image | Description | Medium | Dimensions |
|-----|-------|-------------|--------|------------|
| 89 |  | **Blue Men on Skateboard, White Background** | acrylic on canvas | 23 x24 inches |
| 90 |  | **Dancing on the World, Red Background** | acrylic on canvas | 73 x 58 inches |
| 91 |  | **Green Three Eyed Square Head** | acrylic on canvas | 23 x 36 inches |
| 92 |  | **Three Torso Man** | ink | |
| 93 |  | **Snake Dance, Black Background** | acrylic on canvas | |