UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH BILINSKI, GEORGE LATHOURAS, LISA CUBISINO, JACQUELINE PETRUZZELLI, ANTHONY PETRUZZELLI, ARTHUR CANARIO, GERALDINE BIEHL, JESUS RAMOS, and LUCAS SCHOORMANS, <br><br>Plaintiffs, <br><br>-against- <br><br>THE KEITH HARING FOUNDATION, INC., THE KEITH HARING STUDIO LLC, THE ESTATE OF KEITH HARING, JULIA GRUEN, KRISTEN HARING, GILBERT VAZQUEZ, ALLEN HARING, TOM ECCLES, DAVID STARK, and JUDITH COX, <br><br>Defendants. | **Case No. 14-CV-1085** |
| TAMI STURM, MAXINE KOBLEY, STEPHEN KOBLEY, DIANNE DUNCAN, RANDY NICHOLS, INEZ STRYSICK, BEVERLY COSTELLO, BRENDAN COSTELLO, KHRISTOS KARASTATHIS, EVA KARASTATHIS, and GERI BERMAN, <br><br>Plaintiffs, <br><br>-against- <br><br>THE KEITH HARING FOUNDATION, INC., THE KEITH HARING STUDIO LLC, THE ESTATE OF KEITH HARING, JULIA GRUEN, KRISTEN HARING, GILBERT VAZQUEZ, ALLEN HARING, TOM ECCLES, DAVID STARK, and JUDITH COX, <br><br>Defendants. | **Case No. 14-CV-1582** |

## SECOND CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by their attorneys, allege the following upon knowledge as to their own acts and upon information and belief as to all other matters. Plaintiffs' claims are asserted against defendants The Keith Haring Foundation, Inc. ("Haring Foundation" or "Foundation"), The Keith Haring Studio LLC ("Studio LLC"), The Estate of Keith Haring ("Haring Estate"), and certain officers and directors of the Haring Foundation (collectively, "Defendants").

## INTRODUCTION

1.      This action arises out of Defendants' wrongful disparagement of Plaintiffs' personal reputations and property. Plaintiffs are the owners of a series of artworks created by the deceased artist Keith Haring ("Haring Works").[1] One would expect that artwork signed by, and traceable to, Haring is considered "authentic." However, as detailed below, Defendants publicly disparaged the Haring Works as "***counterfeit***" and "***fake***," and publicly accused Plaintiffs of "suspected fraud," despite never properly examining the pieces, and all while refusing to review information offered by Plaintiffs establishing the artworks' authenticity (e.g., written witness statements, sales receipts, deposition testimony, photographic evidence, handwritten notes from Keith Haring, and forensic expert reports). As also detailed below, Plaintiffs are merely the latest victims in Defendants' longstanding conspiracy to restrain the lucrative market for Haring artworks by abusing the Foundation's exclusive authentication power and sweeping intellectual property rights.

2.      Keith Haring was an influential artist and social activist of the late 20th century. His work responded to the New York City street culture of the 1980s by expressing concepts of birth, death, sexuality, and war. Throughout his career, Haring devoted much of his time to

---

[1] A chart showing the Haring Works is attached as Exhibit A. A collection of high-resolution images showing certain of the Haring Works in closer detail is attached as Exhibit B.

public works with clear social messages concerning subjects like drug addiction and AIDS. As a result, his work was often heavily political and his imagery has become a widely recognized visual language of the 20th century.

3.    Twenty-four years after his untimely death at age 31 from AIDS-related complications, Haring has become one of the hottest names in the art world. His globally recognized images have skyrocketed in value in the last several years, reaching a record high at Sotheby's contemporary art auction in May 2014 ($4.869 million), when the three all time top sales prices were achieved.

4.    When Haring died in 1990, his will directed that a foundation be set up in his name, funded with proceeds from the sale of paintings, drawings, and other works of art left in his estate. His will also directed that the foundation provide a significant portion of its earned income to specific charities. *Haring's will had no provision for the authentication of his artwork*. Nonetheless, until 2012, the Haring Foundation's directors operated an authentication committee that accepted applications for review of artworks attributed to Haring and exerted its influence and control to act as the final arbiter of authenticity in the marketplace.

5.    Several other large artist-endowed foundations have established similar authentication boards over the years, including those for Andy Warhol and Jean-Michel Basquiat. Many have attracted tremendous controversy for the way they operate in secret and refuse to explain their decisions, some of which have subsequently been shown to be clearly incorrect. While some might claim such explanations would "help the forgers," owners are left to speculate why the paintings they bought in good faith, frequently for large sums of money, are suddenly rendered completely worthless.

6.     This wall of silence has driven many aggrieved owners to seek relief from the courts. In 2007, collector Joe Simon-Whelan filed a class action lawsuit against The Andy Warhol Foundation for the Visual Arts, Inc. and its authentication board for refusing to authenticate a picture from Warhol's 1965 series of red self-portraits, and conspiring to control the Warhol art market. More recently, the estate of Swiss art dealer Gerald Cramer filed a lawsuit alleging that the Alexander Calder estate blocked the sale of a $1 million sculpture by falsely claiming that his "*Eight Black Leaves*" mobile is just a fragment of a larger work, and by fraudulently controlling the Calder market.

7.     Even among an unscrupulous bunch, however, the Haring Foundation's misconduct stands out as especially egregious. For years, disturbing reports have emanated from the Foundation's offices, which are located in New York City in the same space that Haring used as his last studio. Gallery owners, dealers, and collectors have submitted authentic works only to have the Haring Foundation unexpectedly declare them "not the work of Keith Haring." Works have even been denied authenticity despite bearing Haring's signature and having well-documented and undisputed provenance (including, in some cases, sworn testimony from people who were very close to or collaborated with Keith Haring, thereby tracing the work directly to the artist).

8.     Nor do these owners have any meaningful recourse if they disagree with the Haring Foundation's decision: to have their works reviewed, each was required to sign a contract purporting to release the Haring Foundation and its members from any wrongdoing. The contract also stated the authentication committee would issue "merely" an "opinion." Like every dictator or tyrant, however, the Haring Foundation's is the only opinion that ultimately matters in the global market for Haring artwork.

9.      The stakes of these determinations are enormous. Without a certificate of authenticity from the Haring Foundation – or at least its tacit approval – no major auction house is willing to sell a Haring artwork. Not only does this create artificial scarcity in the market for Haring artworks generally, such an arrangement particularly favors Defendants and their co-conspirators, all of whom undoubtedly own or transact in Haring artwork bearing the Haring Foundation's seal of approval. Indeed, in just the years 2008 through 2011, the Haring Foundation sold more than $4.5 million of its inventory of Haring artworks at prices inflated by Defendants' manipulations.

10.     At the same time, these determinations are inherently suspect because the Haring Foundation is both the final arbiter of authenticity and an active participant in the market for Haring artwork. With assets in the range of $25 million worth of art (at least as of 2011), the Haring Foundation funds its activities, in part, by selling the works it owns. This creates a massive, unavoidable conflict of interest that, as detailed herein, has predictably led to abuse of the Foundation's power to decide what is and is not an authentic Haring.

11.     One way the Haring Foundation has abused this immense power is by demanding a *quid pro quo* for authentication. In some cases, for example, the Foundation has offered to authenticate certain pieces for an owner in return for a "donation" of other pieces. In others, the Foundation has demanded that owners sign over the copyrights to their artworks as a precondition for authentication.

12.     The Haring Foundation has also abused its authentication power by playing favorites. The same painting may be authenticated when submitted by a favored dealer, co-conspirator, or member of the Foundation's inner circle, but denied authentication if submitted by someone outside Defendants' web of influence. For example, an artwork owned by the late

Dennis Hopper, with provenance very similar to the Haring Works, was authenticated by the Haring Foundation following the actor's death in May 2010. Similarly, the Foundation has agreed to authenticate a piece that had previously been rejected for a fine art gallery in Los Angeles specializing in modern art. At a minimum, such conduct raises serious doubts about the Foundation's competence and integrity.

13. The Haring Foundation has further abused its power as the final arbiter of authentication standards to carefully define Haring's image and censor important facts about his working methods (e.g., uncredited collaboration with other artists) and personal narrative (e.g., personal relationships in Haring's past), in an apparent effort to cultivate his artistic and personal legacy.

14. In September 2012, following years of litigation against other similarly constructed authentication committees in which art owners challenged their arbitrary and improper decisions, the Haring Foundation announced it was dissolving its own authentication committee. Despite the committee's formal dissolution, however, the Haring Foundation has continued to function as the final *de facto* arbiter of authentication for Haring artwork. Moreover, the Haring Foundation now claims to own virtually all intellectual property rights relating to Keith Haring. This has allowed Defendants and their co-conspirators to continue manipulating the market for Haring artwork to their advantage.

15. Plaintiffs are just a few of the many victims of Defendants' malicious and anticompetitive conspiracy, which has destroyed Plaintiffs' reputations and the value of a series of paintings they own that were created by Keith Haring (i.e., the Haring Works). As detailed herein, Defendants took the extreme step of publicly declaring the Haring Works as "counterfeit" and "fake," and publicly accusing the owners of these Haring Works of "suspected fraud,"

falsehoods that were particularly egregious given Defendants' steadfast refusal to consider evidence of the Haring Works' authenticity that Plaintiffs had amassed and repeatedly attempted to submit to the Foundation for consideration in good faith.

16.     By way of background, in 2007, Defendants agreed to review 41 of the Haring Works.[2] Defendants denied the authenticity of the works based on their review of a single photographic transparency of each work. Defendant Julia Gruen, an authorized representative of the Haring Foundation and the Haring Estate, stated that Defendants' conclusion subsequently "may change by reason of circumstances arising or discovered."

17.     In reliance on this statement (and others), Plaintiffs expended significant time and resources, over the course of many years, obtaining additional information establishing the authenticity of the Haring Works. However, when Plaintiffs attempted to submit this newly discovered evidence to the Haring Foundation in 2011, Defendants arbitrarily and unreasonably refused to consider that information or to otherwise express a conclusion on the authenticity of the Haring Works.

18.     Undeterred, and still convinced of the Haring Works' provenance, Plaintiffs continued to accumulate evidence of their authenticity. In or about March 2012, Guernsey's (a well-regarded auction house that conducted a landmark graffiti art auction in June 2000) performed its own independent investigation of many of the Haring Works and concluded that they were indeed authentic. Similarly, in or about, August 2012, Art Access & Research (UK) Ltd. ("Art Access & Research") conducted a forensic analysis of some of the Haring Works, which showed they were likely produced during the time period during that Haring worked.

---

[2] *See* Ex. A at 1-3, 13, 51-73, 82, 90, 95-98, 111.

19.     Beginning on March 6, 2013, most of the Haring Works were featured in an art show titled "Haring Miami" and held at the Moore Building in Miami, Florida.[3] On March 8, 2013, however, the Haring Foundation filed a lawsuit and emergency motion against the organizers of Haring Miami seeking an injunction on the basis that the Haring Works on display were "fakes," "forgeries," and "counterfeits." Defendants also issued a press release referencing the lawsuit and motion, falsely disparaging the Haring Works as "fakes," and maliciously accusing Plaintiffs of "suspected fraud."

20.     Even then, the status of Plaintiffs' collection could have been resolved amicably if the Foundation had simply agreed to consider (in consultation with unbiased experts in Haring's art and working methods) the documentary and forensic evidence of authenticity. Instead, Defendants have opted to pursue an unholy public crusade against Plaintiffs and their artwork that, as the facts about the collection demonstrate, has no basis in reality.

21.     In this case, Defendants' public declarations that the Haring Works are "fake" and "counterfeit," and that the owners of the Haring Works are guilty of "suspected fraud," are the equivalent of stamping Plaintiffs and their property with a scarlet letter. The conclusions of respected authorities like Guernsey's and Art Access & Research mean nothing because the Foundation disagrees.

22.     By Defendants' own admission in their Miami lawsuit, if the Haring Works are real, they are each "worth in the range of $500,000 to $1 million dollars." At a minimum,

---

[3] 84 of the 111 Haring Works appear in the catalog for the show. *See* Ex. A at 1, 2, 3, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 66, 69, 70, 71, 72, 73, 74, 76, 77, 78, 80, 82, 86, 87, 88, 91, 93, 94, 95, 96, 97, 98, 100, 101, 102, 103. The 27 Haring Works that do not appear in the catalog have been rendered similarly unsalable as a direct and foreseeable result of Defendants' defamatory statements about, and anti-competitive misconduct toward, Plaintiffs and their artwork.

therefore, Plaintiffs have suffered millions of dollars in damage to their artworks, and millions more in damages to their reputations, all as a direct and foreseeable result of Defendants' misconduct.

## **PARTIES**

23.     Plaintiffs Bilinski, Lathouras, Cubisino, J. Petruzzelli, A. Petruzzelli, Canario, Biehl, Ramos, Schoormans, Sturm, M. Kobley, S. Kobley, Duncan, Nichols, Strysick, Beverly Costello, Brendan Costello, K. Karastathis, E. Karastathis, and Berman are owners or joint owners of the various works identified on Exhibit A.

24.     Defendant the Haring Foundation is a New York not-for-profit corporation with its principal place of business at 676 Broadway, New York, NY 10012. The Internal Revenue Service treats the Haring Foundation as a "Private Foundation."

25.     Defendant Studio LLC is a limited liability corporation created in 1990, located at 676 Broadway, New York, NY 10012.

26.     Defendant the Estate is located at 676 Broadway, New York, NY 10012.

27.     Defendant Julia Gruen is an individual residing in New York and Executive Director of the Haring Foundation. Gruen was also the executor of the Haring Estate. Upon information and belief, Gruen has acted as the Foundation's exclusive sales agent for paintings, determining who could buy a Haring and at what price.

28.     Defendant Kristen Haring is an individual residing in New York and a Director of the Haring Foundation.

29.     Defendant Gilbert Vazquez is an individual residing in New York and Vice President of the Haring Foundation.

30.     Defendant Allen Haring is an individual residing in New York and Treasurer of

the Haring Foundation.

31.     Defendant Tom Eccles is an individual residing in New York and a Director of the Haring Foundation.

32.     Defendant David Stark is an individual residing in New York and Secretary of the Haring Foundation. Stark is the President of Artestar, which is a licensing and consulting company that represents the Haring Foundation, among other clients. The Haring Foundation's website directs visitors with inquiries about licensing or promotional use of Haring's artwork to contact Artestar and Defendant Stark.

33.     Defendant Judith Cox is an individual residing in New York and a Director of the Haring Foundation.

## **VENUE AND JURISDICTION**

34.     Venue lies in this District pursuant to 28 U.S.C. §1391(a) and (b).

35.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because Plaintiffs' Lanham Act claim arises under 15 U.S.C. § 1125(a).

36.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because Plaintiffs' antitrust claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and are brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

37.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider claims arising under state law.

# FACTUAL ALLEGATIONS

## Keith Haring: Background of the Artist

38.     Keith Haring had a brief, but prolific, career. He was born in Reading, Pennsylvania in 1958. He initially planned on becoming a commercial artist, and attended the Ivy School of Art in Pittsburgh for two years. He ultimately decided to change course and attend the School of Visual Arts in New York City, where he met fellow artists Jean-Michel Basquiat and Kenny Scharf.

39.     Haring initially achieved public attention with artworks in subways, which were his first recognized pieces of pop art. These exhibitions were filmed by the photographer Tseng Kwong Chi, who also took thousands of photographs of Haring throughout the 1980s working on murals, installations, and the subway. (In 1984, Tseng's photographs were shown with Haring's work at the opening of the Semaphore Gallery's East Village location in a show titled "Art in Transit.")

40.     Starting in 1980, Haring organized exhibitions in Club 57. In June 1980, he participated in the "Times Square Show" (a mass exhibition with over 100 artists) and drew, for the first time, animals, and human faces. That same year, he photocopied and pasted around New York City provocative collages made from cut-up and recombined headlines from THE NEW YORK POST. In 1981, he sketched his first chalk drawings on black paper and painted plastic, metal, and found objects.

41.     Between 1982 and 1989, Haring produced more than 50 public artworks around the world, many of them for charities, hospitals, children's day care centers, and orphanages. The now famous "*Crack is Wack*" mural of 1986 has become a landmark along New York City's FDR Drive. Other projects include: a mural created in 1986 for the 100th anniversary of the

Statue of Liberty that Haring created with 1,000 children in a CityKids Foundation event in New York; a mural on the exterior of Necker Children's Hospital in Paris, France in 1987; and a mural painted on the Berlin Wall three years before its fall. Haring also held drawing workshops for children in schools and museums in New York, Amsterdam, London, Tokyo, and Bordeaux, and produced imagery for many literacy programs and other public service campaigns. Haring was such a prolific public artist that new works are still being discovered decades after his death. In December 2007, for example, an area of the American Textile Building in the TriBeCa neighborhood of New York City was discovered to contain a painting of Haring's from 1979.

42.     By 1982, Haring had established friendships with fellow emerging artists like Futura 2000, Kenny Scharf, Madonna, and Jean-Michel Basquiat. During the 1980s, Haring further became acquainted with Andy Warhol, who was the theme of several of his pieces including "Andy Mouse." Haring's friendship with Warhol would prove to be an important element in his eventual success. In 1986, Haring opened his famous downtown Pop Shop with Warhol's backing.

43.     Since his untimely death in 1990, Haring has been the subject of several international retrospectives. In 1996, a retrospective at the Museum of Contemporary Art Australia was the first major exhibition of his work in Australia. His art was the subject of a 1997 retrospective at the Whitney Museum in New York. In 2008, there was a retrospective exhibition at the Musée d'art contemporain ("MAC") in Lyon, France. In February 2010, on occasion of the 20th anniversary of the artist's death, the Tony Shafrazi Gallery showed an exhibition containing dozens of works from every stage of Haring's mature work. In March 2012, a retrospective exhibit of Haring's work, *Keith Haring: 1978-1982*, opened at the Brooklyn Museum in New York. And in April 2013, *Keith Haring: The Political Line* opened at

the Musee d'Art Moderne de la Ville de Paris and Le Centquatre, which will travel to the de Young Museum in San Francisco in November 2014.

**The Haring Foundation**

44.     Haring started the Haring Foundation in 1989, shortly before his death, to ensure that his philanthropic legacy would continue indefinitely. Since then, the Haring Foundation has been charged with fulfilling various directives in Haring's will. These include:

(a)     to administer and distribute funds to aid organizations, institutions, and individuals that engage in charitable and educational activities, especially those that assist and protect young children and encourage them in developing their full potential, as well as organizations involved in research, care, and activities related to AIDS;

(b)     to distribute property and grants to institutions, such as museums or schools that exhibit and/or make art works created by Haring available for viewing and study by art historical scholars and/or by the general public; and

(c)     to perpetuate the understanding of works created by Haring, through publication of reproductions of Haring's writings, drawings, paintings, or other works in the form of books, films, or video tape.

***Notably, Haring's will did not include a provision that directed the Foundation to authenticate his artwork.***

45.     Haring's will also specifically directed the Haring Foundation to make distributions of its earned income as follows: 25% to The Children's Village of Dobbs Ferry, New York, and 25% to the Boys Club of the Lower East Side of New York City. While the Haring Foundation has stated that it makes grants to a variety of not-for-profit groups that engage in the aforementioned charitable and educational activities (including the Children's

Village and Boys Club), it has distributed only a relatively small percentage of its gross income in recent years. For example, in 2007 and 2008, the Haring Foundation distributed only 5% and 2% of its gross income, respectively.

46.     One of the ways that the Haring Foundation earns income is by selling Haring works. Other than a few specifically identified pieces in his will (some of which were received by certain of the Individual Defendants), Haring bequeathed the entirety of his works to the Haring Foundation, which has maintained a collection of Haring art since his death. Between 2008 and 2011, the Haring Foundation has sold millions of dollars of these Haring artworks. For example:

| Year | Gross Artwork Sales |
|------|---------------------|
| 2011 | $2,009,003 |
| 2010 | $1,524,513 |
| 2009 | $ 940,646 |
| 2008 | $ 124,525 |
| Total | $4,598,687 |

47.     The Haring Foundation has also received millions of dollars from lucrative licensing and royalty agreements since Haring's death. In fact, according to a recent FORBES article ("*Earnings From the Crypt*," dated Feb. 28, 2001), Haring has been one of the highest paid deceased celebrities:

| Rank | Name | 2000 Earnings |
|------|------|---------------|
| 1 | Elvis Presley | $35 million |
| 2 | Charles Schulz | $20 million plus |
| 3 | John Lennon | $20 million |
| 4 | Theodor "Dr. Seuss" Geisel | $17 million |
| 5 | Jimi Hendrix | $10 million plus |
| 6 | Bob Marley | $10 million |
| 7 | Andy Warhol | $8 million |
| 8 | J.R.R. Tolkien | $7 million |
| 9 | Frank Sinatra | $6 million |
| 10 | Jerry Garcia | $5 million |

| **11** | **Keith Haring** | **$4 million plus** |
|---|---|---|
| 12 | Marilyn Monroe | $4 million |
| 13 | James Dean | $3 million |

48.     The FORBES article goes on to explain that in 2000, "Haring sold $2 million worth of collectibles alone, surpassing the $1.5 million worth of limited edition Haring artwork the foundation sold." It is not apparent from the Foundation's tax returns where this revenue is channeled. For example, the Haring Foundation's IRS Form 990-PF for 2000 ("Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation") does not reflect any royalty income for 2000 – or any year for that matter until 2008:

| Year | Royalty Income |
|---|---|
| 2011 | $1,141,390 |
| 2010 | $1,069,593 |
| 2009 | $1,161,261 |
| 2008 | $840,002 |
| 2007 | $0 |
| 2006 | $0 |
| 2005 | $0 |
| 2004 | $0 |
| 2003 | $0 |
| 2002 | $0 |
| 2001 | $0 |
| 2000 | $0 |

49.     The lack of any reported royalty income until 2008 appears to be inconsistent with Haring's will, which bequeaths to the Haring Foundation his works of art, as well as "any copyrights relating thereto" and "trademarks."

50.     The Haring Foundation also exercises tremendous leverage over the market for Haring artwork by deciding which galleries can exhibit, which dealers can sell, and which auction houses can host auctions of, works from the Foundation's collection. These favored galleries and dealers are frequently the only ones who can sell Haring artwork through the major auction houses without fear the Foundation will interfere. And if the Foundation is opposed to a

sale, no major auction house will touch a piece regardless of its provenance.

51.     The cumulative effect of these group boycotts by galleries, dealers, and major auction houses has been to severely restrict the supply of Haring artworks in the marketplace. Indeed, of the countless authentic Haring artworks in existence, only three were sold through Sotheby's in their Contemporary Art Evening Auction in May 2014 (and none through Christie's). Two of those pieces were sold by the same dealer, Jeffrey Deitch, who is one of Defendants' closest allies in their efforts to restrain the market for Haring artworks. Those two sales totaled $9,458,000, and not surprisingly, exceeded the auction house's estimates by several million dollars.

**The Haring Foundation's Authentication Committee**

52.     The Haring Foundation has never published a definitive *catalogue raisonné* of Haring's works (i.e., a scholarly compilation of his body of work). Until recently, however, the Haring Foundation maintained an authentication committee that accepted applications for review of artworks attributed to Haring. Formally, the authentication committee was operated by Studio LLC, an opaque business affiliate of the Haring Foundation. In reality, this independence is an illusion. Studio LLC is a member of Defendants' anti-competitive conspiracy, with offices in the same building as the Haring Foundation, and the authentication committee was controlled by the Foundation and its members.

53.     For years, Defendants abused this authentication committee's power to favor certain dealers, co-conspirators, and members of the Foundation's inner circle. For example, an artwork owned by the late Dennis Hopper, with provenance very similar to the Haring Works, was authenticated by the Haring Foundation following the actor's death in May 2010. Similarly, the Foundation agreed to authenticate a piece that had previously been rejected for a fine art

16

gallery in Los Angeles specializing in modern art.

54.     In or about September 2012, Defendant Gruen announced that the authentication committee was being dissolved and no new applications for review would be accepted. According to a press release dated September 14, 2012, the decision to dissolve the committee was purportedly made to better serve the public and the Haring Foundation's charitable mission by redirecting resources to purposes more directly related to the charitable goals designated by the Haring Foundation's founder (i.e., Haring). In reality, however, the dissolution of the authentication committee ostensibly makes it easier for Defendants to evade liability for the committee's past improper denials of authentic Haring artworks and continuing efforts to exclude competing Haring artworks from exhibition and sale.

55.     The principal effect of this dissolution has been to inflate the value of any works with a certificate of authenticity from the Haring Foundation. As Gracie Mansion, a senior specialist at Artnet Auctions, explains: "It leaves a lot of work out there that people don't know is authentic or not. Works with certificates from the foundation, which is probably a small percentage, will be more valuable, as will works that have been in catalogues or museum shows."

56.     Major auction houses claim to require such a certificate as a condition of sale. According to Miety Heiden, head of contemporary private sales at Sotheby's North America: "If people come to us with a work without a certificate, we won't sell it." In reality, most will still sell artwork by Haring that has not been certified as long as the Haring Foundation tacitly approves. For example, Sotheby's held an auction of such uncertified works ("Keith Haring: Shine On") approved behind the scenes by the Haring Foundation in April 2012.

57.     In some cases, it is also possible to sell uncertified works privately where buyers

are confident of their authenticity. But such sales occur at substantially lower prices because the submarket for these authentic but uncertified Haring artworks has been artificially depressed.

58.     As described herein, despite the official end of the authentication committee, the Foundation continues to enforce its determinations via group boycott of owners attempting to authenticate and/or sell their uncertified works privately. Additionally, as also described herein, the specter remains that the Haring Foundation will unilaterally abuse its monopoly over intellectual property rights related to Haring's work to interfere with the exhibition and private sale of Haring works that have not been certified. Indeed, by Defendants own express admission, the "Haring Foundation now owns virtually all intellectual property rights relating to Keith Haring."

### History and Provenance of the Haring Works

59.     Plaintiffs are a group of individuals from various walks of life, including teachers, doctors, and entrepreneurs. Over the years, they have collectively assembled an impressive and diverse collection of artworks – including the Haring Works. Plaintiffs began purchasing the Haring Works in 2007 (directly and indirectly) from two friends of Keith Haring: Angelo Moreno and Delta Cortez (also known as Delta Dos or Delta 2).

60.     Angelo Moreno was a DJ at a club called The Inferno (West 19th Street in New York City) in 1982 when he was introduced to Haring by their mutual friend, Larry Levan (who was a DJ at another club). Moreno and Haring attended numerous parties and social events together, often doing drugs such as cocaine, crack, and Quaaludes.

61.     It is indisputable that Haring and Moreno knew each other and were close. There are numerous pictures of the two of them together and letters from Haring to Moreno. As detailed below, in one such letter, Haring describes Moreno as "'sweet' physically [and]

'inside,'" and states "I always feel comfortable around you and appreciated your friendship."

62.     The two eventually became lovers. In fact, Moreno has stated that he believes he contracted HIV from Haring over the course of their relationship.

63.     From approximately 1982-83, Moreno spent a great deal of time with Haring, observing him paint at his studio, in public, and at Moreno's apartment. During the 1980s, Moreno obtained numerous artworks from Haring, including the Haring Works.

64.     Cortez first became aware of Haring in 1979 when the two were graffiti artists leaving their respective tags throughout the New York City subway system. It was through their connections (like Patti Astor of FUN Gallery in Soho) that Cortez eventually met Haring and became friends. In or about 1984, the two collaborated with several other up-and-coming artists on the immensely successful Basel Art Fair at the La Placa Gallery on Varick Street.

65.     In the years that followed, Cortez saw Haring socially on at least ten different occasions, including in 1985 and again in 1987. In 1990, shortly before his death, Haring visited Cortez a final time at Water the Bush, the Los Angeles nightclub where Cortez was working as artistic director. The two affirmed their friendship.

66.     Moreno and Cortez first met back in 1982, at the Paradise Garage nightclub in New York. The two next crossed paths at a New York nightclub in 1986, then again at a Manhattan flea market in 1991.

67.     In or about 1997, Cortez became acquainted with Jesus Ramos ("Ramos") who was working at an antique furniture store on the Lower East Side of Manhattan. The two would often talk painting and art.

68.     In 1999, Moreno and Cortez once again ran into each other at another flea market at 26th Street and 5th Avenue in Manhattan. Moreno mentioned to Cortez that Haring had left

him a number of artworks. Cortez was intrigued and inquired whether certain specific artworks were among them as they might be saleable. Moreno replied that he believed they were but that he could not recall where he had stored those specific works. Moreno promised he would look for them and report back to Cortez.

69.     Approximately four months later, Moreno telephoned Cortez with news he had found the requested artworks. Moreno proposed that, if Cortez could sell the artworks, Moreno would pay him a percentage of the proceeds. Cortez agreed and the two began selling the Haring artworks Moreno owned to various galleries and collectors.

70.     One such buyer was Ramos, who purchased artworks, initially by himself for resale, then later on behalf of others such as Bilinski, who provided the money to purchase the artworks. Cortez explained the artworks were from Moreno, and showed Ramos pictures of Moreno with Haring, but Moreno never personally met or dealt with Ramos directly. Ramos purchased numerous artworks from Moreno and Cortez in this fashion.

71.     Many of these buyers wanted paperwork certifying the artworks as authentic, which Moreno was unable to provide. Cortez contacted the Haring Foundation in hopes of obtaining such paperwork for some of the artworks in Moreno's possession. A representative of the Haring Foundation eventually returned his calls and expressed a strong interest in the artworks Cortez had mentioned and requested pictures and descriptions of the artworks.

72.     Cortez approached Moreno with this news and argued the artworks would fetch an even higher price if they were authenticated by the Haring Foundation. Moreno was reluctant, believing the Haring Foundation to be controlled by crooks. But Cortez was insistent about continuing to communicate with the Haring Foundation.

73.     Eventually, Cortez was contacted by the Haring Foundation and informed that, if

he wished to sell the artworks in question, the Haring Foundation would be willing to authenticate one or two of the pieces so long as he agreed to give the Haring Foundation ten of the pieces. After inquiring with his contacts in the art community, Cortez concluded it would be better not to pursue authentication from the Haring Foundation at that time.

74.     In or about 2006, however, Cortez again approached the Haring Foundation about obtaining the proper paperwork for the same artworks. At that time, Cortez was informed in a phone conversation that the Haring Foundation was not certifying artworks like the ones he wished to submit. Further conversations and inquiries proved fruitless.

**The Haring Foundation's Refusal to Authenticate the Haring Works**

75.     In or about January 2007, Bilinski showed the collection to Lucas Schoormans, a respected dealer and gallery owner who worked as Larry Gagosian's right-hand man during the period when Haring first became commercially popular. Bilinski carefully researched Schoormans' reputation prior to meeting with him, speaking with knowledgeable figures in the art world like Tony Shafrazi, all of whom spoke highly of Schoormans.

76.     Schoormans studied the Haring Works closely and was so convinced of their authenticity that he purchased several pieces for himself (which are among the Haring Works).

77.     Schoormans persuaded Bilinski it was standard operating procedure, and in their best interests as owners, to have the Haring Works formally authenticated by the Haring Foundation.

78.     On or about March 28, 2007, Schoormans submitted photographic transparencies and letters of provenance from Cortez and Moreno for 13 of the Haring Works on behalf of Bilinski to the Studio LLC for review by the authentication committee. Schoormans also submitted a letter from himself attesting to the Haring Works' provenance.

79.     On or about Friday May 4, 2007, Schoormans submitted photographic transparencies and letters of provenance from Cortez and Moreno for 28 additional Haring Works on behalf of Bilinski to the authentication committee for review.

80.     ***The next business day***, on or about May 7, 2007, the authentication committee categorically rejected the 41 Haring Works and claimed they were "NOT AUTHENTIC." Particularly given the length of time, it is clear that no legitimate or proper examination was done. The letter of rejection offered no explanation for this result, but left open the door for the authentication committee to revisit its ruling at some later date by stating that its determination could "change by reason of circumstances arising or discovered . . . after the date of this opinion."

81.     In the absence of any explanation, Plaintiffs gathered additional evidence to prove the works were real (e.g., written statements, sales receipts, deposition testimony, photographic evidence, handwritten notes from Keith Haring, and forensic expert reports).

82.     For example, on or about October 24, 2007, Moreno signed a "Statement of Origin" that the artworks purchased by Bilinski were either gifted directly by Keith Haring to Moreno or acquired by him:

> Pertaining to the entire group of works by Keith Haring, presently stored at Lucas Schoormans Gallery, I Angelo Moreno certify that each of the works was either gifted directly to me by Keith Haring or acquired by me.

83.     Also as part of this research, on or about December 17, 2007, Moreno was deposed by an attorney for Bilinski and Schoormans. Moreno testified as follows:

Q.     Did there come a time that you met Keith Haring?

A.     Yes. . . . I met Keith in my hey day, meaning my 20s. . . . I used to work in nightclubs. I was a disc jockey. . . . I met him at [nightclub] Inferno, 19th Street and Fifth Avenue. . . .

Q.     And around when was that?

A.      This was like '82, '83 maybe. Around there. Yes. Early '80s. . . . And we went to some parties. Some wild parties. . . . And we became friends.

Q.      Did there come a time that you got any artworks from Keith [Haring]?

A.      Yes.

Q.      Can you tell me about those circumstances?

A.      We started hanging out more and more. I mean, we became part of the woodwork on the Lower East Side. And Keith was painting. At that time, I put no value in his work. He gave me quite a few. I took quite a few.

Q.      What do you mean "took"?

A.      Took. Like, *hey, I am having this. Can I have this? Hey, yeah. No, you can't have it. Yes, I can.* Owner by possession.

Q.      Well, did you steal it?

A.      No. It wasn't stealing. . . . Stealing is, *hey, give that back to me*. It wasn't like that.

Q.      Okay. Was your – did your relationship ever become something more than a friendship?

A.      Did he go to bed with me, yes.

Q.      And was this a – did that happen frequently or over a period of time?

A.      Over a period of time.

Q.      About what period of time?

A.      A year.

Q.      Around when?

A.      '83, '82. Around there.

Q.      Did you remain friendly after that?

A.      Yes.

Q.      Did your intimate relationship end at a certain point and you remained friends?

A.      Yes, yes. But it wasn't like a proclaimed ending like. It wasn't like that. It was a stupid promiscuous relationship that I paid dearly for.

Q.      Then could you explain what you mean by that?

A.      I am sick.

Q.      And it's related to that?

A.      Yes.

* * *

Q.      Now, the period of time in which Keith gave you these works . . . can you describe sort of how it happened? Was it over a few years? Was it batches? Was it one at a time? Give me some –

A.      No. It was over the years. It wasn't like one lump sum. No.

Q.      Could you describe like one circumstance?

A.      One circumstance was he was painting one. I really liked it. I kept telling him, *I want that*. And he says, *I can't give you this one*. I said, *I want that one. I want it*.

Q.      Do you remember which one it was?

A.      It had a lot of red in it. It was a little figure. And I wound up getting it. . . . That's how I wound up getting quite a few of them. Just declaring them.

Q.      And being persuasive?

A.      Yes.

Q.      And charming?

A.      A little bend of the arm.

* * *

Q.      Tell me, when you got these, was it pretty much always by going to the studio, or was it pretty much always by going to the studio, or was it under any other circumstances?

A.      Most of them were in the studio. But he used to paint in the apartment, too.

Q.      This is your apartment?

A.      Yes.

Q.      This is at 340 Madison [Street]?

24

A.     Yes.

84.     During his deposition, Moreno was shown various documents that demonstrate his close relationship with Keith Haring. One of these documents was a picture of Keith Haring and Moreno taken in approximately 1987 at a party at the Loft nightclub:



*Haring, left; Moreno, center.*

85.     There are other documents showing the close relationship between Moreno and Keith Haring, including handwritten notes in which Haring describes Moreno as "'sweet' physically [and] 'inside,'" and states "I always feel comfortable around you and appreciated your friendship":

TO
ANGELO.

ANGELO. THINGS ARE LOOKIN GOOD
OVER HERE, I HAVE TO MORE SHOW'S
TELL THE BOYS AM BRING'S SOME
GOODY'S FROM THE ISLAND.

IT'S GOOD THAT I WENT ON THE
TRIP, IT MAKES YOU APPRECIATE
WHO YOUR FRIEND'S ARE ASIDE
FROM ALL THE BULLSHIT

KEITH HARING.



K-Haring ⊕ ox oy



P.S.

IT's LIKE YOU KNOW WHO YOUR

FRIENDS ARE BEFORE YOU EVEN KNOW

THEM REALLY. ANY WAY, BESIDES THE FACT

THAT YOU'RE REALLY "SWEET" PHYSICALLY +

"INSIDE" I ALWAYS FEEL REAL COMFORTABLE

AROUND YOU AND APPRECIATED YOUR FRIENDS!

I ALSO REALLY ENJOYED BEING WITH YOU.

SOME THING QUIK I'M IN A CAB, BUMPY
RIDE SORRY....

SEE YOU SOON

K·Haring ⊕

86.     On or about December 17, 2007, Cortez was also deposed by an attorney for Bilinski and Schoormans. The following picture shows both Haring and Cortez:



*Haring, center; Cortez, far right.*

87.     In his deposition, Cortez testified about his own relationship with Haring, as well as his dealings with the Haring Foundation and efforts to authenticate Haring works he was selling to Bilinski, et al. For example:

Q.      You found out about a foundation?

A.      Yes.

Q.      Do you remember the name of the foundation?

A.      Keith Haring Foundation.

Q.      Tell me what your interaction was with that.

A.      Okay. I went there with – first I sent them a letter stating that *I have some tiles and I would like some paperwork. These are from Keith Haring, that he got from the subway system in New York City.* They said, *we are very interested.*

Q.      Did they say this in writing?

A.      Yes. They sent me a letter.

Q.      Do you have the letter?

A.    I have the second letter. I don't have the first letter.

* * *

Q.    All right. So what did the first letter say? We are interested, very interested?

A.    Yes. We are very interested. And we would like to know how many of these do you have, that was the question. And where did you purchase these. We would like to know the history of where did you get them from. And we will get back to you. Two months went by and then I wrote back. No, I called. I called and I asked to speak to whoever was in charge. And I got the runaround. And then I got a phone call from a lady, which I don't recall who it was. But she said that she was the representative of the Foundation that ran the panel. And she asked me where did I receive the stuff. And I said to her, well, not to change the subject. I also have drawings that I received from Keith Haring personally from a show from the Fun Gallery. So she said, okay. Why don't you take some pictures of the drawings and the tiles and send them to me. So that's when I called Angelo [Moreno]. And I told him this, if we get some paperwork, we could get more money for this artwork you have and we will be sitting pretty. So he said, I have heard of the Foundation. I don't want to deal with them. They are crooks. Blah, blah, blah. I said, well, I am going to do it myself. Don't worry about it. So they sent me a letter again like four months later. They were interested, they wanted to know how many I had. Because they wanted all of them. And I said, I am not selling all of them. So they sent me the letter. And they told me that they weren't interested right now. But if I wanted to sell them, wanted to get rid of them – I have to find the letter, because I don't want to tell you something that is not right.

Q.    It's okay. Just vaguely your recollection. That's all we are getting to.

A.    ***Basically they said that – like I said, they wanted to give me paperwork for one, two tiles. But they wanted me to donate ten tiles***. That's what I recall. And that's what turned me off about it. And I didn't know. So I asked around to other galleries and art dealers. And they all told me the same thing. They said, you are going to have a rough time with the Foundation. Because if you don't know nobody or you are not in their crowd, you are not going to get nothing done. You got to know somebody, Delta. So I said okay. So I waited. I waited for a while. And I sold a couple to friends with the knowledge to them saying, listen, right now there is no paperwork on these. And they were laughing at me saying, what are you talking about paperwork. So I explained to them. They said, oh, really, this is what is going on. I said, yes. But then I wrote them a letter recently. And they specifically told me – no, I am sorry. On the phone they told me that we're not giving paperwork for nothing that is

from the subways. Anything that has to deal with the subways, the posters that were black with the chalk on it, tiles, subway maps, subway sign, we're not giving certificates for any of that stuff. So I explained to them, why is that not in your Internet or in your paperwork stating that. They didn't have an answer. So why didn't you say that before. No answer. They didn't want to be bothered. Something about the holiday. I said, okay, no problem. I said, then I could sell this if I want, since there is no paperwork. Would I get in trouble. They said, well, we would like to see what you have. You know, runaround thing. They want their hands on everything, because they don't want nobody else making money. That's my ideology. I don't know if it's true or false. But that's how I feel and I have heard and I have seen them, you know. That if it's not – they are not in that dance, they don't want nobody else dancing to it.

Q.      I want to go through like what they actually said. They said – they put in a letter to you –

A.      Yes.

Q.      -- that they wanted a donation of tiles?

A.      Yes.

Q.      In exchange for authentication?

A.      Right.

Q.      Did they make any other proposals to you of, give me this and then I will authenticate it?

A.      Yes.

Q.      Tell me more about that in detail.

A.      We will give you authentication for a couple of tiles in exchange for ten to 15 tiles.

Q.      Okay. I got the tile transaction. And you said there is a letter that reflects that?

A.      Right.

* * *

Q.      So tell me about the Foundation asking for all of the artwork.

A.      Okay. Let me rephrase myself. They didn't ask for all of the artwork, like we want it all. They asked about the artwork, how many paintings do you

have. Because I did my homework, trying to call as someone else. Because I wanted to act like I was a gallery or a dealer to see if this was true. If they were correct or if they were doing something wrong. ***So they said, how many do you have. I said, well, I got ten paintings. They said, well, we will – we could use the paintings for – they wanted to donate some of the paintings to the Multiple Sclerosis Foundation. They said, we will give you certificates for one, but can give us five to donate to the Multiple Sclerosis Foundation***. And it was a weird phone call. And then I never heard back from them again.

Q.    Well, all right. Help me out here. I thought you had said that when you spoke to them, you told them only about subway tiles?

A.    Yes.

Q.    And then you had never had any dealings with them?

A.    No. But I called acting like a gallery to see if they would say something different.

Q.    On or around when did you call as a gallery?

A.    This is last year, this was last year.

Q.    You acted like you were from –

A.    A gallery.

Q.    Did you give a name of a gallery?

A.    I said Gallery Zero something. I just said, just a name, any gallery.

Q.    Just made up a name?

A.    Yes. Made up a gallery and said that I had some paintings. Were they interested in them. They said – and what would be the procedure. And it was a random phone call. This was when I already was with Lucas and Liz. And we were trying to figure out a way to see they kept denying. First they say yes and then they say no. It was a lot of shady things going on. So let me play it out, let me call them. And nothing happened out of that. I didn't say what paintings they were, I didn't say who I was, I didn't say Angelo or nothing. I just said paintings. And that's what they had said. ***There was a young guy that hold told me that. He said, yes, well, we will take – we will give you the certificates for one, certificates of authenticity. That's exactly what he said. In exchange for a couple of paintings***. That was it. Never got back to me.

31

88. During this same period, Mr. Schoormans made an appointment at Phillips auction house in hopes of obtaining their assistance in documenting the authenticity of the Haring Works. His efforts, however, were similarly unsuccessful. While the Phillips representatives were impressed with the Haring Works, they were unwilling to do anything against the wishes of either the Haring Foundation or Defendant Gruen.

89. Shortly thereafter, and approximately one year after the Haring Works were denied, Bilinski received a letter dated May 8, 2008, from the Haring Foundation's legal representative, Eric R. Johnson of the law firm of Stout Thomas & Johnson. This letter falsely accused Bilinski of "selling" or making "available to sell items you are representing to be original works by Keith Haring when you have been duly warned they are not." The letter went on to threaten legal liability "for copyright infringement, trademark infringement and other claims," unless Bilinski immediately ceased and desisted any such activity.

90. Bilinski's legal representative, Raymond J. Dowd of Dunnington, Bartholow & Miller, responded in a letter to Mr. Johnson dated May 12, 2008, stating Bilinski had "not sold or attempted to sell the works," and that they would "welcome an opportunity to discuss this matter with the Foundation." The letter further revealed Bilinski suffered from multiple sclerosis. Neither Mr. Johnson, nor anyone else from his law firm ever responded to this letter.

91. After receipt of this letter, Schoormans telephoned Mr. Johnson in an effort to communicate further. However, Mr. Johnson refused to discuss the matter further and threatened to contact the Federal Bureau of Investigation about Bilinski.

92. In or about December 2008, Orion Analytical LLC ("Orion") was enlisted to conduct a forensic analysis of three of the Haring Works. Orion is a consulting firm that investigates the structure and chemical composition of materials comprising cultural property

(e.g., paintings), forensic evidence, and manufactured goods. Orion's clientele includes art historians and conservators, auction houses and galleries, museums and non-profit institutions, attorneys and law enforcement agencies, collectors, Fortune 500 companies, the Solomon R. Guggenheim Museum, Christie's, Sotheby's, the United States Department of Justice, and the Federal Bureau of Investigation. Orion assists these clients in ferreting out artistic forgeries.

93.     By letter dated December 28, 2008, Orion delivered its report on the three Haring Works. The Orion report provided details concerning the materials and craftsmanship, and provided objective points of comparison with other known Haring artworks.

94.     In or about the spring or summer of 2010, Bilinski and Petruzzelli made an appointment at Sotheby's. There they spoke with Scott Nussbaum, Vice President at Sotheby's and a Specialist in contemporary art. After inspecting the Haring Works and hearing the story, Nussbaum told them off the record that he believed the artworks were authentic but that he could do nothing to help them because of Julia Gruen.

95.     Thereafter, on or about May 26, 2010, Bilinski and Petruzzelli met with Ken Maxwell of Gagosian Gallery, who inspected six of the Haring Works at Artex, which is an art-storage facility in New York City. These six Haring Works included "Portrait on Radiant Baby, 1985" (Ex. A at No. 94) and "Heart, 1985" (Ex. A at No. 98).

96.     Maxwell was initially exuberant about the Haring Works, raving they were "incredible" and gushing that he was "looking at history." At the end of the meeting, Maxwell expressed a strong interest in helping Bilinski get the pieces authenticated. However, by the time Maxwell followed up by email, on or about June 3, 2010, he had cooled considerably. He expressed sympathy for Bilinski's situation, but explained that, "after conferring with a few

people I have to take a step back." Upon information and belief, one of the people with whom Maxwell conferred was Defendant Gruen.

97.     In or about June 2010, Bilinski's representative (Petruzzelli) telephoned Defendant Gruen's assistant to explain the situation and request advice about how best to approach the Haring Foundation about reconsidering its judgment as to the Haring Works in light of new evidence. The assistant suggested they write a letter to Defendant Gruen – advice Plaintiffs took.

98.     Shortly thereafter, in or about July 2010, Bilinski's representative wrote the Haring Foundation explaining that they had expended much time and money collecting new evidence of the Haring Works' authenticity, that they believed they now possessed the information necessary to complete the authentication process, and that they looked forward to setting up a meeting in person to resolve the situation.

99.     Defendant Gruen replied by email dated July 15, 2010, thanking Bilinski's representative for her letter and requesting that Bilinski's attorneys contact the Haring Foundation's attorneys.

100.    Bilinski's representative responded by email dated July 19, 2010, requesting a brief telephone conversation with Gruen.

101.    In emails dated July 19 and 20, 2010, Gruen insisted that Bilinski provide a written Power of Attorney or notarized letter authorizing her representative to speak on her behalf. Bilinski's representative replied she would obtain the requested written authorization. But she balked at the Haring Foundation's requirement they submit the rejected Haring Works via Bilinski's attorneys, noting those very same attorneys had advised them to do precisely the opposite. Gruen responded that they were required to proceed in this fashion because of

Bilinski's supposed threats to sue and pursue criminal action against the Haring Foundation. Bilinski's representative replied it was the Haring Foundation that had threatened legal action.

102.    On January 24, 2011, Bilinski's representative emailed Gruen requesting confirmation the Haring Foundation would not reconsider its judgment.

103.    By email dated February 7, 2011, Gruen informed Bilinski's representative the Haring Foundation would "not be revisiting our opinion on your works."

104.    In view of this second unjustified denial and the Haring Foundation's outrageous refusal to even consider new evidence of the Haring Works' authenticity, in or about March 2012, Plaintiffs' representative approached Guernsey's auction house and explained the situation with the Haring Foundation. By letter dated March 5, 2012, Guernsey's President informed them that, after viewing the "substantial body of work," and independently conducting its "own investigation," the auction house had concluded that "many of the works appear to be authentic." The letter stated that while the Foundation may have previously refused to authenticate the artwork, Guernsey's was sufficiently convinced of the artworks' authenticity to be willing "to produce an auction of the Collection."

105.    In or about August 2012, Art Access & Research was enlisted to conduct further forensic analysis of two of the Haring Works. In a report dated August 16, 2012, Dr. Nicholas Eastaugh of Art Access & Research, a leading expert in the scientific analysis of paintings, concluded:

> Two paintings on canvas, thought to be works by Keith Haring (1958-1990), were submitted for analysis of the materials. Painting A depicts two green men and a man in a car against a blue background; Painting B depicts two red men and an orange snake against a dark background. Both carry inscriptions on the reverse, one (B) incorporating the number '85'; presumably the date 1985.

> The primary question posed for the examination was to confirm whether or not the material composition of the paintings is consistent with the proposed

attribution and dating by means of a study of their constituent pigments. Similarities between the works and a stated common origin allow us to consolidate the findings so that pigments found on one work may be used to infer the status of the other.

In the present examination it has been demonstrated that the paintings could be considered as having been produced in the mid-1980s. No materials of undoubted introduction post-dating the death of Haring in 1990 were detected.

106. Despite Guernsey's conclusion of authenticity, and Art Access & Research's findings supporting a conclusion of authenticity, the Haring Works remain unsalable at anything approaching fair market value because of Defendants' interference described herein.

**Defendants Publicly Disparage the Haring Works and Their Owners**

107. In early 2013, Plaintiffs agreed to participate in a show organized by Michael Rosen ("Rosen"), President of Colored Thumb Corp. ("Colored Thumb") featuring the Haring Works. The year prior, Rosen had organized a successful and lauded show in Miami featuring the art of Salvador Dali. Plaintiffs' participation in the show was arranged by The Weingrad Group LLC, an art consulting group that helped produce the critically acclaimed documentary "Who The $%&* Is Jackson Pollock?"

108. The show was titled "Haring Miami" and held at the Moore Building in Miami, Florida, from March 7-10, 2013. Opening night was a special VIP event held on or about, March 6, 2013. The guest of honor was Anthony Shriver, the noted disability advocate and founder of Best Buddies International ("Best Buddies"), a charity supporting children and adults with intellectual and developmental disabilities. The official logo of Best Buddies was created by Keith Haring. A portion of the proceeds from the show were earmarked for donation to Best Buddies and the HIV/AIDS awareness and treatment organization Care Resources.

109. Unbeknownst to Plaintiffs or Haring Miami's organizers, Defendant Stark had crashed the party with his sister, and, at least in his mind, was attempting to judge the

authenticity of the paintings. Stark's efforts were stymied by, among other things, the dim lighting, the crowded launch party, and his inability to take any paintings off the wall for inspection. Instead, Stark was limited to only taking photos of some of the works – an unspecified number of which were actually photographed by his sister – before the two were finally asked to leave by security.

110.     On March 8, 2013, the Haring Foundation filed suit against Rosen and Colored Thumb in United States District Court for the Southern District of Florida, for willful trademark infringement, trademark dilution, copyright infringement, false advertising, cybersquatting, and false designation of origin under 15 U.S.C. §§ 1114, 1125(a); 1125(c), 17 U.S.C. § 101 et seq. ("Miami Complaint"). The Miami Complaint stated that "many works featured in Defendants' show that purport to be by Keith Haring were submitted to The Haring Foundation for authentication in 2007 by a collector named Liz Bilinski [and the] Haring Foundation advised Ms. Bilinski that the works were not authentic." Miami Complt. ¶14. The Miami Complaint also referred to "fake works" that "appear in the catalogue of the show," and asserted that "[e]very work appearing in the catalogue is fake except for two works." The Miami Complaint further indicated "[s]ome of the works at the show are for sale." *Id.* at ¶22.

111.     Also on March 8, 2013, the Haring Foundation made an emergency motion ("Emergency Motion") seeking a temporary restraining order against Rosen and Colored Thumb. The motion noted there was a "significant business in the production of fakes and forgeries, often promoted by 'pop up' exhibitions intended to defraud the public," and falsely asserted that Haring Miami "is one of these ***fraudulent*** 'pop up' exhibits." Motion at 1 (emphasis added).

112.     The Haring Foundation further issued a press release, also dated March 8, 2013, discussing the Miami Complaint and Emergency Motion, and touting the Haring Foundation's

supposed deterrence of "suspected fraud" ("March 8 Press Release"). The March 8 Press Release further described the Haring Works as "*__fake__*" – a statement that is false and particularly without basis given that the Haring Foundation's original denial of authenticity was based only on a photographic transparency of the works, and Defendants (including Defendant Gruen) refused to consider the additional provenance information collected by Plaintiffs and offered to the Haring Foundation on numerous occasions.

113.    As a result of Defendants' conduct, including their libelous public statements, the Haring Works were withdrawn from the Haring Miami show.

114.    Plaintiffs also failed to consummate planned sales to interested buyers. For example, Arthur Canario lost the sale of artwork (including but not limited to Ex. A at 108) belonging to him and to the collection, to a museum in London, England as a result of Defendants' tortious interference. Indeed, in an email dated March 10, 2013, a representative of the buyer specifically cited the allegations in the March 8 Press Release as the reason for backing out of this planned purchase.

115.    Plaintiffs repeatedly gave the Haring Foundation opportunities to view the Haring Works, which it declined.

116.    The Haring Foundation and its members never physically inspected the Haring Works – that is, other than Defendant Stark's hollow attempt to photograph the pieces during the Haring Miami party, which, among other things, necessarily precluded him from spending more than a few seconds with each work and could not have included an examination of the full piece (including the back of each work, which could include the artist's signature or a dedication by the artist).

117.    Indeed, Stark conceded in his declaration filed with the Emergency Motion that

some unspecified number of the photographs from the Miami Show were actually taken by his sister (who is not affiliated with the Foundation). That strongly suggests, at a minimum, that Stark never even ***saw*** a number of the Haring Works before Defendants publicly disparaged them as "counterfeit" and "fake." Moreover, Stark has a business background (not art), and is responsible for handling ***licensing*** work for the Foundation.

118.    Prior to issuing their defamatory statements, the Haring Foundation and its members never reviewed the information collected by Plaintiffs regarding the provenance of the Haring Works.

119.    By Defendants' own admission in the Miami lawsuit: "***Each*** of these works of art [in the Miami Show], if they were real Haring works, would be ***worth in the range of $500,000 to $1 million dollars***." Miami Complt. ¶23 (emphasis added). Also by Defendants' own admission in the Miami lawsuit: "if the approximately 80 acrylic works on canvas in the show were real Harings, their collective value would be more than $40 million." *Id.* ¶24. Also by Defendants' own admission in the Miami lawsuit: "There is also a strong market for Keith Haring's original works, which sell for very significant sums (depending on the size of the work, the medium, and other factors)." *Id.* ¶2. Accordingly, the estimated fair market value of the Haring Works as authentic Harings is at least $40 million.

120.    Plaintiffs are unable to sell the Haring Works because, among other things, no auction house will now sell the paintings as a Haring work given the Haring Foundation's wrongful refusal to consider the authenticity of the Haring Works and their public declarations of the works as "fakes" and the result of "fraud." Thus, given the Haring Foundation's misconduct, Plaintiffs have been substantially damaged in an amount not less than $40 million.

**Many Haring Works Have Been Wrongfully Denied Authentication by Defendants**

121.    Defendants' crusade against Plaintiffs and their artwork is hardly an isolated occurrence. Numerous other people and entities have been similarly victimized by having their Haring artworks improperly rejected (or forced into hiding) by the Haring Foundation. In many cases, these owners never even sought the Haring Foundation's view in the first place, but were nonetheless threatened with civil or criminal prosecution if they took any steps to display or sell their works.

**The Cassinelli Collection**

122.    Gary Cassinelli was a close friend of Keith Haring's in the 1980s. They would see each other in clubs in New York City. Haring also frequented Arturo's, a pizzeria in SoHo owned by Mr. Cassinelli's family.

123.    Over time, Haring gave Mr. Cassinelli and his family at Arturo's a number of pictures, paintings, and objects, on which he painted his well-known images. For example, one item that Cassinelli received from Haring was a vintage Coca-Cola sign signed by Keith Haring:



The sign is emblazoned with Haring's distinctive drawings in white paint on metal. Figures include the "Radiant Baby," the "Barking Dog," and the "Dancing Man." The sign was placed daily on the sidewalk in front of Arturo's for years.

124.    Similar to Plaintiffs' experience, Scott Nussbaum (Specialist in contemporary art at Sotheby's) looked at the Cassinelli Collection, said it was great, but that he could not do anything without the Foundation's approval. Then, in April 2010, the Carmichael Gallery in Los Angeles agreed to exhibit 17 paintings from the Cassinelli Collection. The gallery was about to hold the show, including the Cassinelli Collection, when they received a threatening cease and desist letter from the Haring Foundation's lawyers. The letter further demanded the Carmichael

Gallery remove an image of a supposedly fake Cassinelli piece hosted on the gallery's website in connection with the show. Other than the single image available on the Carmichael website, the Foundation never even saw the Harings slated for inclusion in the show (let alone bothering to physically examine any of them) before declaring them "fake" and siccing its lawyers upon the organizers of the show.

**Harry Shasho**

125.     Harry Shasho is another owner of authentic Haring artworks who has been victimized by the Haring Foundation. The Shasho collection currently includes several acrylic paintings, drawings on board, and molding with Haring drawings.

126.     Mr. Shasho inherited approximately ten pieces from his father, Sam Shasho, who passed in 1999. Sam owned an electronics store in New York City (Victoria Camera, 1541 Broadway, which later relocated to Nassau Street) and acquired the pieces from a close friend of Haring named John Sex. According to the authorized biography of Keith Haring written by John Gruen (art critic and father of Defendant Julia Gruen), John Sex's real name is John McLaughlin, and he hails from Long Island. John Sex met Keith Haring while studying graphic design at the School of Visual of Arts. According to Sex: "There was this little gallery space on the first floor, and Keith had painted in from floor to ceiling. I looked at it and said, 'This person is really doing something!'" Sex continues:

> "After a while, I gave up the graphic stuff, because I wanted to be a performer. My first performances were at Club 57, where Keith and Kenny [Scharf, artist, friend and former roommate of Haring], and Drew [Straub, artist, writer and friend of Haring] and a whole bunch of us were hanging out. So I performed at Club 57 and at the Mudd Club and at Danceteria. One time I performed at Paradise Garage for Keith's birthday. Madonna was performing there too. Much later I performed at Palladium, and for me that was the height. It was in 1985 – and after that it was all kind of downhill. But Keith was always around. He was everywhere and he had this amazing energy and his stuff had this art energy and we were always together. It was me and Keith and Drew and Kenny . . . it was the

four of us!"

127. John Sex was a customer at Sam Shasho's store. He acquired a few thousand dollars worth of camera equipment from the elder Shasho, over a period of approximately five years, in exchange for a number of artworks Sex owned by Haring (and other artists). The first of these exchanges occurred in or about 1980, when Sam Shasho gave John Sex $800 or $900 credit in exchange for a Warhol lithograph. There were approximately four or five such transactions over the years, involving approximately ten Haring works. Each of the pieces is signed by Haring, with two of them including dedications to John Sex.

128. After acquiring the works, Sam asked his son Harry to determine their market value. Harry began by consulting places like the Haring Pop Shop (a store opened by Haring devoted to his work) and the Marks Gallery. Sam also attempted to ascertain the value of the works from an auction house, taking one of the Harings (and the Warhol lithograph) to Sotheby's in 1991. He was informed he could expect to receive between $1,800 and $2,300 for each of pieces. Sam agreed to sell the Warhol (which ultimately fetched $22,000 several weeks later) but decided to hold on to the Haring.

129. In 1997 or 1998, Sam informed Harry he wanted to submit one of the Haring pieces for authentication. However, Sam refused to submit the piece upon learning he was required to transfer any copyrights associated with the piece to the Haring Foundation as a precondition for authentication.

130. After Sam Shasho died in 1999, Harry undertook to sell the Haring works himself. In or about 2008, Harry brought all of the works to Sotheby's a few months before one of the auction house's contemporary/pop art auctions. After examining the entire collection, the Sotheby's representative expressed great excitement, informing Harry that one of the Haring pieces was very important historically and that they wanted to feature it on the cover of

Sotheby's upcoming auction catalog. In a familiar pattern, however, the representative explained this was all pending Julia Gruen's review and approval. Gruen refused to come to Sotheby's to examine the piece and it never went to auction.

131. After his experience at Sotheby's, Harry attempted to sell one of the pieces on eBay. Bids reached as high as $20,000, before he received a letter (and a follow up phone call) from one of the Haring Foundation's lawyers, demanding that Harry and eBay take the piece down. eBay complied. The Foundation's lawyer informed Harry that he was ***not*** permitted to sell the piece on eBay and that he needed to submit the piece to the Haring Foundation before putting it up for sale again anywhere else.

132. Following Harry's run-in with the Foundation's lawyers, in May or June 2010, he submitted the same piece to the Haring Foundation for authentication. Months passed without any answer. In August or September 2010, Harry called asking for an update. The woman he spoke to said the Foundation "can't authenticate" the piece and would not provide any explanation. She promised Harry they would send him some paperwork in connection with the decision, but the paperwork never materialized.

133. With fewer options, in or about October 2010, Harry approached gallery owner Tony Shafrazi in New York. Early on, Haring worked as an assistant to Shafrazi, and ultimately had a professional association with the Shafrazi Gallery. Harry brought to Shafrazi the same piece that had been submitted to the Haring Foundation. Mr. Shafrazi told Harry that if he had "papers" (i.e., a certificate of authenticity from the Foundation), Shafrazi would pay $25,000 for the piece. Without such documentation, however, he would only pay $8,000. Harry declined.

134. Harry next enlisted Ken Hendel, owner of Gallery Art in Aventura, Florida, to assist in getting the works authenticated and selling them for fair market value. Hendel prepared

a new set of papers for submission to the Haring Foundation, including transparencies of the pieces. This new package was sent to the Foundation on Harry's behalf in or about May 2011. Receiving no response, Hendel emailed the Foundation in July or August 2011, asking them to confirm receipt and update him on the status of his submission. On September 29, 2011, the Foundation emailed to say the pieces were not by the hand of Keith Haring and that a hard copy of its decision would follow in three or four weeks. As before, the promised documentation never materialized.

135.    Harry has since been offered $1 million for one of his pieces by a well-known pop singer who is a savvy collector of contemporary art. The sale, however, is conditioned upon the Foundation's acknowledgment that the piece is authentic, which is all but impossible now that the Foundation has dissolved its authentication committee.

**The Victor and Sultana Lallouz Collection**

136.    Victor Lallouz is a filmmaker, art researcher, and collector in Montreal, Canada. He purchased approximately 50 works of art by Keith Haring with a well-researched and documented provenance. For example, Mr. Lallouz has a document that appears to be a bill of sale showing the works originally came directly from Keith Haring:



*www.tulliodesantis.net*

137.    After acquiring the works, Mr. Lallouz contacted Tullio Francesco DeSantis, an American contemporary artist who was a friend and collaborator of Keith Haring. DeSantis and Haring were also both from Reading, Pennsylvania. DeSantis is the publisher of a well-known series of conversations between himself and Haring. Lallouz explained to DeSantis that he had read the Haring/DeSantis dialogues, and that he owned dozens of works said to be from a secret collection of hundreds of pieces executed by Haring in the early-to-mid 1980s. Thereafter, DeSantis worked with Lallouz to research and document the history of the collection. The details about DeSantis's efforts were published on his website.

138.    In or about November 2008, however, DeSantis was contacted by lawyers for the Haring Estate. The lawyers demanded he remove the images of the Lallouz Collection posted on his website – even though the Lallouz Collection had never been submitted for authentication, and even though the Foundation/Estate acknowledged that they did not know one way or the

other whether the pieces were authentic. DeSantis pleaded with them to reconsider, invoking the public's right to know and the freedom-of-expression rights of artists, writers, and citizens to tell their stories – all to no avail.

139.    Because of the Foundation and Estate's conduct, the Lallouz Collection still has apparently never been exhibited or submitted for authentication.

**The Haring Foundation Further Abuses Its Authentication Power by Refusing to Acknowledge Well-Known Collaborators of Keith Haring**

140.    Angel Ortiz is an artist who has publicly accused the Haring Foundation of shutting him out of money and acclaim. The Haring Foundation's treatment of Ortiz is just one more example of how Defendants have abused the Haring Foundation's standard-setting power to cultivate a false and self-serving narrative concerning his working methods.

141.    According to an article in THE VILLAGE VOICE ("*Keith Haring's Silent Partner*," dated July 23, 2002), Ortiz met Keith Haring in the summer of 1980. Ortiz, then 13 years old, approached the 22-year old Haring, who was painting a mural in a Lower East Side schoolyard. Ortiz identified himself as "LA II," a graffiti artist about whom Haring had been curious. At first, Haring could not believe that the work he had admired was created by a teenager. After watching Ortiz scrawl his tag, however, Haring was convinced. That evening, Ortiz helped Haring carry a ladder back to his studio on Broome Street, near the Bowery. A few days later the two collaborated there on a piece of art, combining their signature styles on a yellow metal panel that had once been part of a taxi. When a collector paid $1,400 for the piece, Haring gave half the money to Ortiz.

142.    It was the beginning of a partnership that would last six years, produce hundreds of pieces of art, and include joint shows in New York, Tokyo, and Europe. While Haring went on to wide acclaim, however, the years following the collaborations were not as kind to Ortiz.

For example, his exhibit at the Clayton Patterson Gallery on Essex Street in July 2002 was his first since a 1984 show with Haring in Milan. For most of the intervening years, according to Ortiz, the Haring Foundation has largely ignored Ortiz's part in Haring's history, allowing works he helped create to be exhibited without crediting him, and sometimes even selling work he created all by himself without any credit or compensation.

143.    From 1980 until 1986, Haring and Ortiz met often in the Broome Street studio, painting and drawing for up to 15 hours at a stretch on both canvas and urban detritus like statues, urns, and pieces of metal. According to Ortiz, the partnership was recognized by both artists to be an equal one because their artistic styles complemented each other. Ortiz's calligraphic, interlocking lines vitalized and filled out negative space between Haring's cleanly drawn shapes. And while Haring was older and far cannier, the energy of Ortiz's graffiti-like markings brought freshness and street credibility to his work.

144.    The two formed a strong relationship, which Haring likened to that of an older and younger brother. According to the 1992 Haring biography by John Gruen, Haring recounts: "We just immediately hit it off. It's as if we'd known each other all our lives. He's like my little brother."

145.    In a recent story in the NY TIMES ("*Little Angel Was Here: A Keith Haring Collaborator Makes His Mark*," dated Aug. 5, 2008), Fred Brathwaite, better known as "Fab 5 Freddy," who sometimes acted as Haring's ambassador to the pioneering graffiti culture, is quoted saying: "Back then Keith was looking for influences and inspiration, and he got a great deal of it from LA II's work." The Times article also quotes the artist Kenny Scharf, who was a friend of Haring's: "Keith treated him as a true collaborator; he didn't treat him like some little kid, which he actually was, really. He respected him and gave him half of whatever they

collaborated on." The article further describes a flier from a 1982 exhibition at Tony Shafrazi Gallery in New York that features a photo of Haring and Mr. Ortiz posing in front of a backdrop of their energetic drawings.

146.    By the time of his death, in 1990, Haring had become one of the most famous artists of his generation. His work had been bought by numerous collectors and included in permanent collections at the Whitney Museum and the Museum of Modern Art. Haring had also become rich. But during the 1990s, as the Haring Foundation amassed millions more from the sale and licensing of Haring's work, Ortiz went through difficult times. Socially unsophisticated, and lacking a fine arts education, he could not navigate the art world alone. While continuing to paint and draw, he slept on couches on the Lower East Side and supported himself by working as a bicycle messenger and in a pizzeria.

147.    Ortiz said that Haring occasionally gave him sums ranging from a few hundred dollars to $5,000, while promising that other money owed to him from the sale of collaborations was being placed in a fund. After Haring's death, however, officials at the Haring Foundation told Ortiz such a fund did not exist.

148.    During this period, the Haring Foundation regularly put Haring's solo work up for sale at galleries around the world, often for six-figure prices. But the Foundation has apparently never offered for sale any of the estimated 10 to 15 collaborations it possesses, depriving Ortiz of potential income. Defendant Gruen has said she does not know the value of the collaborations between Haring and Ortiz, and that the Foundation has never felt the need to offer any for sale. Gruen assumes the collaborations are owned wholly by the Haring Foundation, but claims not to know whether Ortiz might have a valid legal claim to part ownership.

149. Some of those collaborations are lent to museums and appear in exhibitions around the globe, but they are not always properly identified. For example, a brochure produced by the Haring Foundation for a 1997 show depicts on its cover a vase painted in black, white, and orange credited exclusively to Haring despite the fact that it prominently features a tag used by Ortiz (LA Rock) that first attracted the attention of Keith Haring in 1980 and can still be seen today on the streets of the Lower East Side. Even Gruen has conceded there "were certainly incidents where oversights were committed."

150. Indeed, beginning in the late 1990s, the Pop Shop on Lafayette Street (one of two stores originally opened by Haring to sell memorabilia of his designs) sold T-shirts and umbrellas bearing designs by Ortiz, which were identified and marketed as created by Haring. Ortiz discovered this by accident after wandering into the store. After Ortiz complained, the Haring Foundation paid Ortiz a dollar for each of 1,800 T-shirts sold for between $15 and $25 apiece. The shop also paid him $182 for umbrella sales totaling $1,824 – less than one percent.

151. Ortiz thought of Haring not merely as a business partner, but as a trusted friend and supporter who plucked him from obscurity, encouraged him to create art, and invited him to share in an adventure. Yet the Haring Foundation appears to prefer keeping him at arm's length.

152. According to Ortiz, "The foundation should've taken care of me, but they didn't. . . . They show my pieces in museums but never invite me. They give money to charity but they ignore their own."

153. Others agree. The artist Richard Hambleton, who during the 1980s toured through Europe with Haring and Jean-Michel Basquiat, said that the role Ortiz played in Haring's development deserves recognition. "Keith learned to fill in blank spaces on the canvas from LA II and that took his art to a new level," Hambleton said. "The way LA has been treated by the

foundation since Keith died is really shameful."

154.    This censoring of works Haring produced in collaboration with other artists like Ortiz is part Defendants' efforts to enhance the commercial viability of Haring's artwork generally by creating the false impression he was its sole creator, and to favor artwork owned by Defendants and their co-conspirators, most of which was created solely by Haring.

**The Millions of Dollars in Haring Artworks Owned by Defendants**

155.    The Haring Foundation's 2011 tax return indicates that the Haring Foundation's assets include works of art with a year-end book value of $5,299,087 and a fair market value of $25,992,418.

156.    Upon information and belief, all (or a vast majority) of the works of art owned by the Haring Foundation are Haring works.

157.    Upon information and belief, the Defendants own substantial amounts of Haring works worth many millions of dollars.

158.    According to the Last Will & Testament of Keith Haring, dated November 10, 1989 ("Haring Will"), Defendant Gruen was bequeathed two paintings or sculptures created by Haring and two drawings created by Haring.

159.    According to the Haring Will, Defendant Kristen Haring was bequeathed two paintings or sculptures created by Haring and two drawings created by Haring.

160.    According to the Haring Will, Defendant Vazquez was bequeathed two paintings or sculptures created by Haring and two drawings created by Haring.

# FIRST CAUSE OF ACTION

## Defamation
## (Against All Defendants)

161. Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

162. Defendants, directly or through a spokesperson, employee, or agent, published or caused to be published a press release on or about March 8, 2013 that described the works in Exhibit A as "fake" and accused Plaintiffs of "suspected fraud." In so doing, Defendants impugned the character and honesty of the owners of the Haring Works by suggesting they were intentionally passing off fake paintings as authentic in an attempt to defraud the public.

163. The March 8 Press Release referred to the filing of the equally defamatory Miami Complaint, which falsely accused Plaintiffs (including Bilinski) of misrepresenting that the works in Exhibit A were painted by Haring when the Haring Foundation had previously declared them not authentic. The March 8 Press Release further referred specifically to the Emergency Motion, which accused Plaintiffs of participating "in the production of fakes and forgeries" and that the purpose of Haring Miami was "to defraud the public."

164. By specifically referring to the lawsuit against Haring Miami, the March 8 Press Release incorporated the Miami Complaint by reference. Further, by specifically referring to the Emergency Motion, the March 8 Press Release also incorporated that filing by reference. All three documents thus represent a single integrated statement for purposes of interpretation.

165. Plaintiffs (including Bilinski) are private individuals, not public figures.

166. Defendants' statements are defamatory *per se* because they injure Plaintiffs' professional name and reputation by stating or implying that they are deceitful, unethical, and without integrity, and by falsely portraying Plaintiffs as guilty of a crime and unfit to sell

artworks by Haring.

167. Defendants published the false and defamatory statements with actual malice because they either knew the statements were false or published them with a reckless disregard for their truth or falsity. At a minimum, Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

168. Defendants were motivated by hatred, personal spite, and/or ill will towards Plaintiffs, and Defendants maliciously published the statements with intent to harm Plaintiffs.

169. Defendants intended and knew that their publication of the defamatory statements described above would be widely reported around the world, thereby causing additional harm to Plaintiffs with each republication.

170. Defendants are not only liable for their own intentional conduct, but are also vicariously liable for the tortious acts of their employees or agents.

171. In making these statements, Defendants were not protected by any privilege, whether qualified or absolute. Indeed, these statements were not simply opinions, but rather empirically verifiable statements of fact, as confirmed by the ample evidence of authenticity that Plaintiffs have amassed and are prepared to offer at trial, and which Defendants refused to review or consider.

172. Additionally, Defendants made these statements either with a high degree of knowledge they were false, and/or with reckless disregard for the statements' truth or falsity, and/or in a grossly irresponsible manner, as evidenced by, among other things, the Haring Foundation's utter refusal even to consider the copious evidence of Plaintiffs' artworks' authenticity despite Plaintiffs' repeated requests for them to do so.

173.     As a result of the defamatory statements described above, Plaintiffs have suffered (and continue to suffer) damages, including injury to their name, reputation, and financial interests.

174.     By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

175.     Additionally, Plaintiffs have suffered special damages in the form of lost sales of their Haring artworks in an amount not less than $8,000,000.

176.     Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Civil Conspiracy to Commit Defamation
### (Against All Defendants

177.     Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

178.     Defendants each entered into an agreement to unlawfully harm Plaintiffs by willfully and maliciously defaming Plaintiffs.

179.     Defendants each committed one or more overt acts pursuant to and in furtherance of their conspiracy to unlawfully harm and defame Plaintiffs, including but not limited to assisting in the drafting, and/or approving the publication, of the false and defamatory March 8 Press Release, and/or approving the filing of the false and defamatory Miami Complaint.

180.     The defamatory statements in the First Cause of Action above are specifically incorporated herein by reference and made a part hereof.

181.     Defendants were motivated solely by hatred, personal spite or ill will towards Plaintiffs and maliciously published the statements with intent to harm. At a minimum,

Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

182.     Defendants are not only liable for their own intentional conduct, but are also vicariously liable for the tortious acts of their employees or agents.

183.     As a result of the conduct described above, Plaintiffs have suffered (and continue to suffer) damages, including injury to their name, reputation, and financial interests.

184.     Due to the fraudulent and secretive nature of Defendants' conduct, it is expected that additional relevant facts will come to light during the discovery process.

185.     By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

186.     Additionally, Plaintiffs have suffered special damages in the form of lost sales of their Haring artworks in an amount not less than $8,000,000.

187.     Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Tortious Interference with Prospective Business Relations
### (Against All Defendants)

188.     Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

189.     Defendants were aware of Plaintiffs' interest in selling their Haring artworks, as evidenced, *inter alia*, by Plaintiffs' repeated requests for the Haring Foundation to reconsider its judgment that certain of their artworks were not authentic.

190.     In fact, Plaintiffs had several interested buyers for pieces from the works in Exhibit A, who were deterred by the Haring Foundation's lawsuit. For example, Dr. Arthur

Canario lost the sale of artwork (including but not limited to Ex. A at 108), belonging to him and to the collection, to a museum in London, England as a result of Defendants' tortious interference. Indeed, in an email dated March 10, 2013, a representative of the buyer specifically cited the false allegations in the March 8 Press Release as the reason for backing out of this planned purchase.

191.    Defendants' malicious filing of a false and defamatory complaint accusing Bilinski of misrepresenting the provenance of her artworks, followed by their equally malicious circulation of a false and defamatory press release referring to "suspected fraud," were independently tortious acts designed solely to interfere with and destroy Plaintiffs' prospective business relationships with these interested third-party buyers. Indeed, the Miami Complaint specifically cites the fact that "[s]ome of the works at the show are for sale." Miami Complt. ¶22.

192.    At a minimum, Defendants acted with culpable recklessness or gross negligence by judging the works in Exhibit A on display at the Miami show as fakes on the basis only of photographs, and by refusing to consider the substantial evidence collected by Plaintiffs of their artworks' authenticity.

193.    As a result of Defendants' improper actions, Plaintiffs have suffered (and continue to suffer) damages, including injury to their name, reputation, and financial interests, as well as lost sales of their artworks to interested third parties.

194.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

195.    Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

# FOURTH CAUSE OF ACTION

## False Advertising Under the Lanham Act
## (Against All Defendants)

196.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

197.    Defendants have falsely advertised and publicized, and conspired to falsely advertise and publicize, the works in Exhibit A as not being authentic, falsely representing to the general public that the works in Exhibit A are "fake" and the result of "fraud."

198.    Defendants have also falsely advertised and publicized, and conspired to falsely advertise and publicize, that the works in Exhibit A are not authentic Haring artworks by failing to withdraw and counteract the adverse information that Defendants themselves disseminated to the marketplace.

199.    Defendants' false and misleading representations in the March 8 Press Release (and Miami Complaint incorporated by reference therein) were unquestionably commercial in nature because they were published, disseminated, and/or otherwise communicated with the intent of preventing sales of the works in Exhibit A and of increasing the value of Defendants' artworks at their expense.

200.    In so doing, Defendants have made, or knowingly conspired and agreed to be made, false and misleading representations of fact in commercial promotions or advertising that misrepresent the nature, characteristics, qualities of geographic origin of Plaintiffs' goods, services, or commercial activities, all in violation of the Lanham Act, 15 U.S.C. § 1125(a).

201.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

## FIFTH CAUSE OF ACTION

### Trade Libel/Injurious Falsehood
### (Against All Defendants)

202.     Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

203.     Defendants were aware of Plaintiffs' interest in selling the works in Exhibit A, as evidenced, among other things, by Plaintiffs' repeated requests for the Haring Foundation to reconsider its judgment that certain of their artworks were not authentic.

204.     In fact, Plaintiffs had several interested buyers for pieces from the works in Exhibit A who were deterred by the Haring Foundation's lawsuit. For example, Dr. Arthur Canario lost the sale of artwork (including but not limited to Ex. A at 108), belonging to him and to the collection, to a museum in London, England (unnamed due to confidentiality concerns, which are typical in art transactions) as a result of Defendants' tortious interference. Indeed, in an email dated March 10, 2013, a representative of the buyer specifically cited the false allegations in the March 8 Press Release as the reason for backing out of this planned purchase.

205.     Defendants' malicious publication of a defamatory March 8 Press Release that described the works in Exhibit A as "fake," as well as Defendants' equally malicious filing of the Miami Complaint, which falsely labeled the works in Exhibit A as not authentic, were calculated to prevent third parties from purchasing the works in Exhibit A from Plaintiffs, and to prevent Plaintiffs from selling the works in Exhibit A to third parties. Indeed, the Miami Complaint specifically cites the fact that "[s]ome of the works at the show are for sale." Miami Complt. ¶22.

206.     Defendants' false statements played a material and substantial part in inducing these third parties not to deal with Plaintiffs with respect to the works in Exhibit A.

207. Defendants' false statements and misrepresentations were clearly commercial in nature because they were published, disseminated, or otherwise communicated with the intent of preventing sales of the works in Exhibit A and of increasing the value of Defendants' artworks at their expense.

208. As a result of Defendants' improper actions, Plaintiffs have suffered (and continue to suffer) damages, including lost sales of their artworks to the aforementioned third parties.

209. By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

## SIXTH CAUSE OF ACTION

### Intentional Infliction of Economic Harm
### (Against All Defendants)

210. Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

211. At all relevant times, Defendants were aware that a purpose in showing the works in Exhibit A at the Miami Show was to advertise the works to potential buyers.

212. Defendants' malicious publication of a defamatory March 8 Press Release that described the works in Exhibit A as "fake," as well as Defendants' equally malicious filing of the Miami Complaint, which falsely labeled the works in Exhibit A as not authentic, were intended to inflict economic harm on Plaintiffs by preventing them from ever selling the works in Exhibit A, either at the Miami Show or at any time in the foreseeable future. Indeed, the Miami Complaint specifically cites the fact that "[s]ome of the works at the show are for sale." Miami Complt. ¶22.

213. Defendants' infliction of economic harm was motivated by malice and ill will

toward Plaintiffs.

214.    Defendants' conduct was not excused or justified by any special circumstances recognized under law.

215.    Thus, to the extent Defendants' misconduct does not violate any other laws, or give rise to any other torts, they are still liable for the *prima facie* tort of intentional infliction of economic harm.

216.    By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

217.    Because of the willful, wanton, and intentional nature of Defendants' conduct, Plaintiffs also demand an award of punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

218.    Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

219.    The Haring Foundation and its members are all dealers and/or collectors of works by Haring.

220.    The price of a work of art by a particular artist is driven in part by the quantity of work available by that artist. By refusing to authenticate the works in Exhibit A and publicly branding them as fakes, the Defendants have limited the number of Haring works in the public domain, thereby increasing the value of the Haring works that the Haring Foundation and its members own or sell.

221.    Defendant Gruen has also knowingly benefited from Defendants' tortious misconduct through continued employment at the Haring Foundation, collecting a generous six-

figure salary worth $362,544 in 2011 alone.

222.     Defendant Stark has also knowingly benefited from Defendants' tortious misconduct through the success and growth of his business Artestar, which has become the exclusive licensing agent for the Haring Foundation, and has estimated annual revenues of at least $380,000.

223.     Additionally, the Haring Foundation has been unjustly enriched by sales of Haring artworks that it owns at artificially inflated prices. In 2008-2011 alone, for example, the Haring Foundation grossed more than $4.5 million in such inflated sales.

224.     The Haring Foundation and its members, through their improper actions, have been unjustly enriched at the expense of Plaintiffs.

225.     Equity and good conscience dictate that Defendants should retain no part of the sums unjustly reaped as a result of their tortious misconduct.

226.     By reason of the foregoing, Plaintiffs are entitled to damages against Defendants in an amount not less than $40,000,000.

## EIGHTH CAUSE OF ACTION

### Violation of § 1 of the Sherman Act and New York Donnelly Act
### (Against All Defendants)

227.     Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

### The Relevant Market

228.     The relevant market being unlawfully dominated and unreasonably restrained by the activities of Defendants and their alleged co-conspirators is the offering and sale, at auction or otherwise, of Haring artwork worldwide.

229.    The market for Haring artworks is actually a subset of the broader global market for modern and contemporary art, which includes approximately 500 artists, including Haring, Basquiat, Warhol, Pollock, Picasso, Miro and Rothko. Each of these individual artists comprises his or her own distinct submarket within the general global market for modern and contemporary art.

230.    This limitation of the relevant submarket specifically to Haring artwork finds support in the following facts, among others:

a.      Haring artworks are typically included in the category of "modern and contemporary artists" in auctions, museum showings, dealer and gallery advertising and sales literature, and newspaper and magazine articles;

b.      Haring artworks are advertised for sale, whether privately or at auction, by specific reference to the name Keith Haring, rather than by generic reference to "modern and contemporary art";

c.      Showings and exhibitions often feature multiple Haring artworks to the exclusion of all other modern and contemporary artists;

d.      Expertise is defined not only in terms of the overall category of modern and contemporary artists, but also for each specific artist. Thus, an expert in Haring artworks may know substantially less about other artists in the category, such as Warhol, Rothko, Pollock and Chagall. Similarly, an expert in modern and contemporary art generally, may lack expertise in the specific subcategory of Haring artworks;

e.      Artists themselves are conscious of, and often influenced by, the style represented by specific artists, as opposed to the styles of modern and contemporary artists generally;

f.      Prospective buyers and sellers estimate the value of Haring artworks primarily by reference to other Haring artworks, as opposed to the hundreds of other artists included in the general category of modern and contemporary art; and

g.      Haring artworks are not interchangeable with works by other modern and contemporary artists because major art purchases are motivated by highly subjective tastes, indicating a lack of cross-elasticity of demand.

231.    The value of modern and contemporary art generally, and Haring artworks specifically, regularly ranges into the millions of dollars (or more) because the supply of artwork from a given deceased artist is fixed, prospective buyers of a given work are brought together in one room at one time for the auction, and bidders can be numerous with substantial funds to bid.

232.    Auctions are held in various cities around the world, including New York and London, and prospective bidders from many countries are often in attendance, either personally or by proxy, to bid at the auction of a specific work of art.

233.    Although the market for artwork is distinct from the market for its authentication, the two are nonetheless closely and inextricably linked. This is because the persons who bid for and buy modern and contemporary art, whether privately or at auctions, are typically unable to ascertain by themselves the authenticity of a work they wish to buy. Bidders and buyers thus rely heavily upon the determination of one or more experts to guide their decisions.

234.    Institutions such as museums, galleries and auction houses routinely arrange for inspections and conclusions from art experts before offering a work of art for sale, particularly if the work is newly discovered and not previously recognized as a work by the artist whose name or style appears on the painting.

235.    By reason of these conclusions, vast sums of money (again, in the millions of dollars or more) are paid for works of art for which an acknowledged expert renders a convincing conclusion of authenticity or probable authenticity.

236.    The persons buying such art are, in fact, buying not just the conclusion and reasoning behind it, but the credentials and expertise of the authenticating expert(s), as well.

237.    Any unreasonable limitation on the use of qualified experts to inspect, employ their expertise, and render their reasoned conclusions on the authenticity of major works of art,

would significantly affect the market for buying and selling such paintings by denying valuable information that the buying and investing public depends upon when determining whether to buy, and how much to pay, for a given work of art.

**Trade and Commerce**

238.     Defendants' acts, as alleged herein, have resulted in the restraint of interstate commerce in New York City, the United States generally, and/or globally, and have tended to create, and actually created, a monopoly in the line of interstate commerce within such geographic areas.

239.     Plaintiffs have been injured in their business and property by reason of the performance of those acts in violation of the antitrust laws.

**Claims Alleged**

240.     Beginning in or about 1990, and continuing up to the date of this Complaint, Defendants and their allies in the art world entered in a contract, combination, and/or conspiracy to restrain trade and commerce, to monopolize, and to attempt to monopolize said trade and commerce in the offering and sale of Haring artworks both domestically and internationally, in violation of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). These violations are continuing and will continue unless the relief prayed for herein is granted.

241.     Pursuant to, and in furtherance of, the aforementioned restraint of trade, actual and attempted monopolization, and conspiracy to monopolize, Defendants have sought to prevent various Haring artworks from being offered and sold, at auction or otherwise, by among other things:

        a.     Abusing the Foundation's status as the final authority for authentication of Haring artworks, and as the owner of "virtually all intellectual property rights relating to Keith Haring," to engage in a group boycott of authentic

competing Haring artworks owned by individuals other than Defendants and their co-conspirators;

b.   Offering to authenticate Haring artworks in return for other Haring artworks from the same owner, then refusing to authenticate the owner's artworks when this offer was refused;

c.   Reversing prior authentication decisions to authenticate artwork that was previously rejected – and vice versa – when doing so serves the interests of Defendants and their allies;

d.   Maintaining an authentication committee that supposedly investigated and rendered an unbiased conclusion on the origin of the artwork brought before the committee for authentication, when in reality the authentication committee neither investigated nor rendered a judgment based on its findings;

e.   Insisting that owners who wish to have their artworks authenticated sign over the copyright for those works to the Foundation;

f.   Formally claiming to shut down the authentication committee while continuing to make judgments of authenticity, and to enforce those judgments through the pretext of lawsuits to enforce the Foundation's exclusive intellectual property rights, despite the supposed end of the authentication committee;

g.   Making judgments of authenticity without following even the most basic standards for authentication, such as physically examining artworks, considering forensic evidence of authenticity, etc.;

h.   Requiring a favorable judgment of authenticity from the Foundation before permitting artwork to be offered or sold as a Haring artwork, whether at auction or otherwise;

i.   Requiring the owner of a Haring artwork to accept the Foundation's determination or denial of authenticity through imposition of a submission agreement that, among other things, purportedly waives any legal claims arising out of the Foundation's conclusions or conduct;

j.   Targeting known Haring owners in an attempt to get them to submit their works for authentication;

k.   Using various ruses to convince owners to submit (or resubmit) their paintings for authentication when denial is a foregone conclusion, thereby removing Haring artworks from the market; and

l.    Employing different standards for the inspection and authentication of artworks owned by Defendants, their co-conspirators, and other famous and/or influential people, than those owned by Plaintiffs and others.

**Effects**

242.    The foregoing combination of conspiracy and violations have had the following effects, among others:

a.    Competition for the purchase and sale of Haring artworks has been substantially restrained;

b.    Competition for the authentication of Haring artworks has been substantially restrained;

c.    By Defendants' own admission, the "Haring Foundation now owns virtually all intellectual property rights relating to Keith Haring," Miami Complt. ¶12;

d.    Owners of authentic Haring artworks will not sell or exhibit their artwork for fear of having that artwork improperly labeled fake and/or being accused of fraud by Defendants and/or their co-conspirators;

e.    Auction and other prices for Haring artworks have been maintained at arbitrary, non-competitive levels for paintings authenticated by Defendants – and at no significant value whatsoever for paintings not authenticated by Defendants;

f.    Plaintiffs, investors, museums, art owners and owners of authentic Haring artwork all have been denied the benefits of a competitive market for Haring artworks and other works of modern and contemporary by deceased famous artists; and

g.    Hundreds of millions of dollars in interstate transactions and commerce relating to the offering and sale of Haring artworks have been restrained.

**Injury to Plaintiffs**

243.    As a direct and foreseeable result of the above-mentioned violations of the antitrust laws, Defendants have excluded the artworks at issue and countless other legitimate Haring artworks owned by Plaintiffs from the marketplace, destroying their investment value.

**Fraudulent and Secretive Activity**

244. Defendants have engaged in a successful illegal conspiracy to restrain the market for authentic Haring artwork by controlling the authentication standards and procedures of Haring artworks in a manner that, by its very nature, is inherently self-concealing.

245. Due to the fraudulent and secretive nature of Defendants' conduct, it is expected that additional relevant facts will come to light during the discovery process.

246. The fraudulent and secretive nature of Defendants' conduct, despite its monumental impact on the segment of the public involved in the market for Haring artworks, is exemplified by the Haring Foundation's refusal to provide Plaintiffs – or other owners whose works have been denied – with any kind of explanation for refusing to authenticate their artworks.

247. Defendants have also fraudulently and deceptively attempted to manipulate the purported scope of their actions to cover up their conspiracy. A foundation and authentication committee with overlapping members is inherently questionable and problematic. The Haring Foundation's solution has been to formally dissolve its authentication committee while continuing to operate *de facto* as the exclusive arbiter of the authenticity of Haring's artworks in the marketplace.

248. The Haring Foundation's reasons for authenticating some works while denying others remain a mystery to the public. The identities of persons involved in these decisions is unknown with the exceptions of Defendants Gruen and Stark – although Gruen appears to exert control over the Foundation's authentication decisions. Her position at the Foundation, and its ownership of millions of dollars in Haring artwork, compromise the integrity of the Foundation's decision-making process.

249.	Market participants with millions of dollars worth of holdings should not be permitted to exercise such final say over authentication decisions that impact the market, restrain trade, and result in monopoly. Defendants and their co-conspirators have abused the Foundation's ultimate authority in this regard to violate the Sherman Act and New York Donnelly Act.

**Irreparable Injury and Injunctive Relief**

250.	If the Court finds that Plaintiffs have not established the market value of the artworks at issue due to lack of access to the market for Haring works, Plaintiffs alternatively allege irreparable injury by reason of Defendants' activities and seek preliminary and permanent injunctions prohibiting Defendants and those acting in concert with them from:

a.	Using the Foundation or any associated entity as a purportedly independent, unbiased, truth-seeking group that endeavors to provide an honest expert judgment concerning the authenticity of Haring works.

b.	Funding any authentication committee, whether directly or indirectly.

c.	Failing to provide a written conclusion for all submissions of works for authentication, setting forth the reasons in reasonable detail why a particular Haring work is deemed authentic or inauthentic as a precondition for interfering with any sale or exhibition.

**NINTH CAUSE OF ACTION**

**Violation of § 2 of the Sherman Act and New York Donnelly Act**
**(Against All Defendants)**

251.	Plaintiffs repeat, reiterate, and re-allege the allegations contained in each of the preceding paragraphs as if fully set forth herein.

252.	The relevant market is defined above in the Eighth Cause of Action relating to the offering and sale of Haring works in New York, the United States generally, and anywhere else in the world that Haring works are bought and sold.

253.     As the final standard-setting authority in the relevant market, and the owner of "virtually all intellectual property rights relating to Keith Haring," Defendants possess the power to arbitrarily exclude the offering and sale of Haring works from said market. No Haring works may be offered for sale anywhere in the world, whether privately or by auction, if the Foundation objects. And to the extent they attempt to do otherwise, the Foundation will simply sue under the pretext of enforcing its intellectual property rights to obtain the same result. Thus, as for any specific Haring artwork, Defendants have total domination of the market to prohibit such painting from being offered and sold either at auction or privately in New York specifically, the United States generally, and anywhere else in the world that art is bought or sold.

254.     The reason for Defendants' overt activities as alleged was to abuse their standard-setting authority to restrain competition unreasonably, to maintain their unlawful market domination, and, alternatively, to monopolize the market for buying and selling Haring works. Indeed, even if Defendants have not yet attained monopoly power, their success in doing so is probable. This is because Defendants are able to leverage their existing total control over the authentication process into monopoly power in the market for buying and selling Haring works.

255.     Defendants' activities affect many tens or hundreds of millions of dollars in interstate transactions and commerce.

256.     This power to exclude persons from the relevant market has been, and continues to be, exercised by Defendants through their combination and conspiracy.

257.     The activities of Defendants constitute a violation of § 2 of the Sherman Act, 15 U.S.C. § 2 and the New York Donnelly Act, § 340 of the New York General Business Law.

258.    By reason of these activities by Defendants, Plaintiffs are unable to sell the artworks at issue in the relevant market and are entitled to damages against Defendants in an amount not less than $40,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A.    On the First Cause of Action against all Defendants, a judgment awarding compensatory damages in an amount not less than $40,000,000, special damages in an amount not less than $8,000,000, and punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct.

B.    On the Second Cause of Action against all Defendants, a judgment awarding compensatory damages in an amount not less than $40,000,000, special damages in an amount not less than $8,000,000, and punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct.

C.    On the Third Cause of Action against all Defendants, a judgment awarding compensatory damages in an amount not less than $40,000,000, special damages in an amount not less than $8,000,000, and punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct.

D.    On the Fourth Cause of Action against all Defendants, a judgment decreeing each Defendant has violated the Lanham Act, and awarding compensatory damages in an amount to be trebled pursuant to 15 U.S.C. § 1117(a), of not less than

$120,000,000.

E.      On the Fifth Cause of Action against all Defendants, compensatory damages in an amount not less than $40,000,000, and punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct.

F.      On the Sixth Cause of Action against all Defendants, compensatory damages in an amount not less than $40,000,000, and punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct.

G.      On the Seventh Cause of Action against all Defendants, compensatory damages in an amount not less than $40,000,000, and punitive damages in an amount sufficient to punish Defendants for their conduct and to set an example to deter others from similar conduct.

H.      On the Eighth Cause of Action against all Defendants, a judgment decreeing each Defendant has violated Section 1 of the Sherman Act and the New York Donnelly Act, and awarding compensatory damages in an amount to be trebled pursuant to 15 U.S.C. § 1117(a), of not less than $120,000,000.

I.      On the Ninth Cause of Action against all Defendants, a judgment decreeing each Defendant has violated Section 2 of the Sherman Act and the New York Donnelly Act, and awarding compensatory damages in an amount to be trebled pursuant to 15 U.S.C. § 1117(a), of not less than $120,000,000.

J.      Restitution to Plaintiffs in amount equivalent to Defendants' unjust enrichment.

K.      Attorneys' fees, pre- and post-judgment interest and costs of this action.

L.    Enjoining Defendants and their agents, whether individually or collectively, from:

     a.    participating in the authentication, whether formally or informally, of artwork purported to be by Haring, so long as Defendants own or have any financial interest in Haring artwork;

     b.    publishing a catalogue raisonné of Haring artwork so long as Defendants own or have any financial interest in Haring artwork;

     c.    preventing the exhibition or sale of the Haring Works or any other artworks purported to be by Haring on the basis they are not authentic;

     d.    refusing to permit the market for Haring artworks to have access to, or consider judgments on authenticity (together with the reasons offered in support of them) rendered by any art experts not approved by Defendants to authenticate Haring artwork; and

     e.    further antitrust violations of the kind alleged in this complaint.

M.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial of all claims that may be tried before a jury.

Dated: New York, New York
       August 12, 2014

                       BROWER PIVEN,
                        A Professional Corporation

                       */s/ Brian C. Kerr*
                       Brian C. Kerr

                       David A.P. Brower
                       Brian C. Kerr
                       475 Park Avenue South, 33rd Floor
                       New York, NY 10016
                       Tel. (212) 501-9000
                       Fax (212) 501-0300

                       *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2014 I served a true and correct copy of the foregoing via ECF on the following:

PROSKAUER ROSE LLP
Sarah S. Gold
Margaret A. Dale
Eleven Times Square
New York, NY 10036
Phone: 212.969.3000
Fax: 212.969.2900
Email: sgold@proskauer.com
Email: mdale@proskauer.com

*Attorneys for Defendants*

Dated: August 12, 2014

_____
*/s/ Brian C. Kerr*
BRIAN C. KERR