UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
ELIZABETH BILINSKI, et al.,            :
                                       :        14cv1085 (DLC)
                    Plaintiffs,        :        (Consolidated)
          -v-                          :
                                       :
THE KEITH HARING FOUNDATION, INC., et  :
al.,                                   :        OPINION & ORDER
                    Defendants.        :
                                       :
-------------------------------------- X

APPEARANCES

For Plaintiffs:
Brian C. Kerr
Brower Piven, A Professional Corporation
488 Madison Avenue, Eighth Floor
New York, NY 10016
(212) 501-9000

For Defendants:
Margaret Antinori Dale
Qian Jennifer Yang
Sarah Schrank Gold
Proskauer Rose LLP (NY)
11 Times Square
New York, NY 10036
(212) 969-3000

DENISE COTE, District Judge:

     Plaintiffs assert that they are owners of Keith Haring

artwork and that the actions the Keith Haring Foundation

("Foundation") and related defendants interfered with the

exhibition and sale of their artwork, reducing the value of

their property.  Keith Haring ("Haring"), who died in 1990, was

a prolific artist and social activist whose work responded to

the New York City street culture of the 1980s.  Plaintiffs bring

federal and state antitrust claims, as well as a false advertising claim under the Lanham Act.  Plaintiffs also seek relief under New York law for defamation, conspiracy to defame, tortious interference with prospective business relations, trade libel, intentional infliction of economic harm/prima facie tort, and unjust enrichment.  Defendants have moved to dismiss the complaint in its entirety.  For the following reasons, defendants' motion to dismiss is granted.

## BACKGROUND

This motion to dismiss is addressed to a consolidated amended complaint ("Complaint") filed on August 13, 2014.  This is the third motion to dismiss the claims in this action, the plaintiffs having been given an opportunity to amend in response to the two prior motions.[1]

The following facts are asserted in the Complaint and taken from documents integral to it.  This case principally concerns

---

[1] Two separate actions were filed by two groups of plaintiffs on February 21, 2014, and March 7, and joined in a consolidated complaint filed on June 24.  On August 13, the plaintiffs amended that pleading in response to a motion to dismiss filed on July 25.  The plaintiffs who filed suit on February 21 are Elizabeth Bilinski ("Bilinski"), George Lathqouras, Lisa Cubisino, Jacqueline Petruzzelli, Anthony Petruzzelli, Arthur Canario, Geraldine Biehl, Jesus Ramos, and Lucas Schoormans. The plaintiffs who filed suit on March 7 are Tami Sturm, Maxine Kobley, Stephen Kobley, Dianne Duncan, Randy Nichols, Inez Strysick, Beverly Costello, Brendan Costello, Khristos Karastathis, Eva Karastathis, and Geri Berman.  The first motion to dismiss was filed on May 9, 2014.

the authentication and sale of Haring artwork.  Defendants include the Foundation, a New York not-for-profit corporation established by Haring to continue his philanthropic legacy, and individual officers and directors of the Foundation Julia Gruen ("Gruen"), Kristen Haring, Gilbert Vazquez ("Vazquez"), Allen Haring, Tom Eccles, and Judith Cox.  The Complaint also names as defendants Studio LLC, the entity that formally operated an authentication committee for the Foundation, as well as the Estate of Keith Haring ("Estate") and David Stark ("Stark"), the president of Artestar, a company that represents the Foundation in licensing and consulting.  Gruen and Stark are compensated by the Foundation; Gruen receives a salary and Stark receives fees for licensing and consulting work.

Haring bequeathed the majority of his works to the Foundation, as well as "any copyrights relating hereto" and trademarks.[2]  The Foundation has maintained a collection of Haring works since his death, valued at approximately $25 million as of 2011.  The Foundation earns income by selling pieces from its collection.

Haring's work is valuable.  From 2008 to 2011, the Foundation sold an unspecified number of Haring works for a total of $4,598,697.  In May 2014, three Harings were sold

---

[2] Haring also bequeathed works to defendants Gruen, Kristen Haring, and Vazquez.

3

through the auction house Sotheby's.  Two of these pieces were sold for $9,458,000 by Jeffrey Deitch ("Deitch"), who the Complaint describes as an "ally" of the defendants.

Until 2012, the Foundation operated an Authentication Committee ("Committee") to review artwork attributed to Haring and issue opinions regarding the authenticity of submitted works.  Although the Committee was formally operated by Studio LLC, it was controlled by the Foundation.  The dissolution of the Committee in 2012 has increased the value of previously-authenticated works.

Many auction houses require a certificate of authentication as a condition of sale, but will sell Haring artwork without a certificate with the tacit approval of the Foundation.  Haring artwork may also be sold privately at reduced prices without authentication or the Foundation's approval.

The plaintiffs own 111 pieces of Haring work they believe to be authentic.[3]  All of this artwork came to the plaintiffs through Angelo Moreno ("Moreno"), who was a personal friend of Haring.  Delta Cortez ("Cortez"), who also knew Haring, acted on behalf of Moreno to sell a number of Moreno's Harings to plaintiff Elizabeth Bilinski ("Bilinski Collection").

---

[3] A list of the works owned by plaintiffs is attached as Exhibit A to the Complaint.  Plaintiffs do not identify which plaintiffs own which works.

In January 2007, Bilinski showed the Bilinski Collection to
an art dealer, plaintiff Lucas Schoormans ("Schoormans").
Working on Bilinski's behalf, Schoormans submitted photographic
transparencies for thirteen works on March 28, 2007, and
transparencies for an additional twenty-eight works on May 4, to
the Foundation.  Schoormans also submitted letters of provenance
from Cortez and Moreno.  On May 7, 2007, the Foundation rejected
the works as "not authentic."  The letter of rejection did not
provide a reason for the rejection, and stated that the
determination by the Committee could "change by reason of
circumstances arising or discovered . . . after the date of this
opinion."  Following the Foundation's rejection, Bilinski
gathered additional evidence of authenticity.  This evidence
included a signed statement of origin from Moreno, in which he
explained that he had received the works as gifts from Haring.
An attorney for Bilinski and Schoormans deposed Moreno and
Cortez.[4]

On May 8, 2008, the Foundation accused Bilinski in writing
of selling or making "available for sale items you are
representing to be original works by Keith Haring when you have
been duly warned they are not," and warned Bilinski that legal

---

[4] The Complaint states that Bilinski contacted the Foundation in
2010 seeking to resubmit the entire Bilinski Collection to the
Committee for authentication.  It does not indicate whether this
additional material was also submitted to the Foundation.

action could follow if she did not cease this activity.  Despite
Bilinski's efforts to address the matter with the Foundation in
2008, the Foundation refused to respond.

In 2010, Bilinski resumed her efforts to sell her
collection.  In the spring or summer of 2010, Bilinski brought
the Bilinski Collection to Sotheby's.  A Sotheby's
representative indicated his belief that the works were
authentic, but reported that he could not do anything to help
her because of Gruen.  Bilinski then brought the works to
Gagosian Gallery on May 26, 2010.  After conferring with Gruen
and others, the gallery refused to offer the works for sale.

Bilinski then sought to resubmit the pieces to the
Foundation for authentication.  In July 2010, Bilinski's
representative, Petruzzelli,[5] wrote to the Foundation that
Bilinski now had the necessary information to authenticate her
collection.  Gruen asked that Bilinski provide a written Power
of Attorney or notarized letter authorizing Petruzzelli to speak
on her behalf, and that she resubmit the Bilinski Collection
through her attorneys on account of Bilinski's previous threats
to sue.  In response to Petruzzelli's inquiry, on February 7,
2011, the Foundation informed Bilinski that it would not
reconsider its judgment about the authenticity of the Bilinski

---

[5] The Complaint identifies Bilinski's representative by a last
name only.

Collection.

In 2012, Bilinski received further confirmation that her Haring works were authentic.  The auction house Guernsey's told Bilinski that the works appeared to be authentic and it would be willing to produce an auction of the Bilinski Collection. Bilinski commissioned a forensic analysis of two of the works. The analysis concluded that the two paintings "could be considered as having been produced in the mid-1980s."

In early 2013, the plaintiffs participated in an exhibition organized by Michael Rosen ("Rosen") and Colored Thumb Corp. ("Colored Thumb") featuring the plaintiffs' Haring works ("Miami Exhibition").  The Miami Exhibition had a VIP opening on March 6, and was scheduled to run from March 7-10.  Stark went to the exhibition to ascertain the authenticity of the works shown.

On March 8, the Foundation filed suit against Rosen and Colored Thumb ("Miami Complaint") and sought a temporary restraining order.  The Miami Complaint described the works shown in the Miami Exhibition as "fakes, forgeries, counterfeits and/or infringements."  The motion for a temporary restraining order referred to the show as "fraudulent."  That same day, the Foundation and the organizers of the Miami Exhibition agreed to the removal of all but ten works from the Miami Exhibition, and to remove and destroy all copies of the brochure and/or catalog

7

for the Miami Exhibition ("Agreement").  In a press release of March 8 ("Press Release"), the Foundation described the lawsuit as an "effort to stop the display of fake Haring works at the exhibition."  The Press Release reports that the organizers of the Miami Exhibition "agreed to remove all fake Haring works from the exhibition immediately and to destroy the offending catalogue that illustrated most of the fake works."  The Press Release also stated that the Foundation "plans to continue to pursue this lawsuit, carrying the message that it will enforce the Foundation's rights and protect the artist's legacy in every case of suspected fraud."  Plaintiff Arthur Canario ("Canario") lost the sale of artwork to an unidentified museum in London as a result of the Press Release and Miami litigation.

## DISCUSSION

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  A complaint must do more than offer "naked

8

assertions devoid of further factual enhancement." Id.
(citation omitted).  A court is "not bound to accept as true a
legal conclusion couched as a factual allegation." Id.

"For purposes of a motion to dismiss, we have deemed a
complaint to include any written instrument attached to it as an
exhibit or any statements or documents incorporated in it by
reference, as well as . . . documents that the plaintiffs either
possessed or knew about and upon which they relied in bringing
the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)
(citation omitted).  Plaintiffs have attached images and
descriptions of their artwork to the Complaint.  The Complaint
also relies upon the Miami Complaint and Press Release.  These
materials may be considered in deciding the motion to dismiss.

## I. The Antitrust Claims

Two of the nine claims raised in the Complaint assert
violations of Sections 1 and 2 of the Sherman Act, and the
corresponding New York State antitrust statute, the Donnelly
Act.[6]  The defendants have raised several grounds to support

---

[6] Except when state policy or legislative history dictates
otherwise, the Donnelly Act is generally coextensive with the
Sherman Act.  See Gatt Commc'ns, Inc. v. PMC Assoc., LLC, 711
F.3d 68, 81 (2d Cir. 2013) (citing X.L.O. Concrete Corp. v.
Rivergate Corp., 83 N.Y.2d 513, 518 (1994)).  No party has
identified, and the Court has not found, any state policy or
legislative history that would require a different
interpretation of the Donnelly Act in this case.  This Opinion
thus analyzes the Sherman Act and Donnelly Act claims

dismissal.  It is unnecessary to discuss each of them.  Assuming
without deciding that the plaintiffs have antitrust standing,
their claims are timely, and the Noerr-Pennington doctrine does
not immunize the filing of the Miami Complaint,[7] the defendants'
motion to dismiss is granted as to the Sherman Act and Donnelly
Act claims.

## A. Conspiracy in Restraint of Trade

The Complaint alleges a violation of Section 1 of the
Sherman Act.  Section 1 of the Sherman Act declares illegal
"[e]very contract, combination in the form of trust or
otherwise, or conspiracy in restraint of trade or commerce among
the several States, or with foreign nations."  15 U.S.C. § 1.
Although the language is capacious, it has been interpreted to
"outlaw only unreasonable restraints" on trade.  Texaco Inc. v.

---

collectively.

[7] Antitrust standing, because it is intertwined with the merits
of the antitrust claim, is not jurisdictional in nature but
rather relates to the merits of a claim addressed through a
12(b)(6), Fed. R. Civ. P., motion to dismiss.  See Lerner v.
Fleet Bank, N.A., 318 F.3d 113, 128-29 (2d Cir. 2003)
(analogizing RICO's proximate cause standing requirement to
antitrust standing and holding that it was not jurisdictional);
In re Lorazepam & Clorazepate Antitrust Litig., 289 F.3d 98,
107-08 (D.C. Cir. 2002).  Similarly, issues of timeliness and
Noerr-Pennington immunity are also decided as part of 12(b)(6)
motion to dismiss.  See Ortiz v. Cornetta, 867 F.2d 146, 149 (2d
Cir. 1989); Primetime 24 Joint Venture v. Nat'l Broad., Co., 219
F.3d 92, 98 (2d Cir. 2000).  Accordingly, the Court may reach
the merits of the antitrust claims without first addressing
these threshold issues.

Dagher, 547 U.S. 1, 5 (2006) (citation omitted).  In order to
state a claim under Section 1, a plaintiff must allege (1) a
contract, combination or conspiracy between two legally distinct
entities, (2) in restraint of trade, (3) affecting interstate
commerce.  See E & L Consulting, Ltd. V. Doman Indus. Ltd., 472
F.3d 23, 29 (2d Cir. 2006); Maric v. Saint Agnes Hosp. Corp., 65
F.3d 310, 313 (2d Cir. 1995).

     "The ultimate existence of an agreement under antitrust
law . . . is a legal conclusion, not a factual allegation."
Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709
F.3d 129, 135-36 (2d Cir. 2013).  At the motion to dismiss
stage, a plaintiff must allege enough facts to support the
inference that a conspiracy actually existed.  Id. at 136.  This
can be accomplished by alleging direct evidence of an agreement,
or by presenting circumstantial facts supporting the inference
that a conspiracy existed.  Id.

     Plaintiffs essentially allege a group boycott between the
defendants and "their allies" in the art world who sell Haring
works.  This boycott excluded the plaintiffs from that market,
resulting in supracompetitive prices for Haring artwork.

     The Complaint fails to state a claim under Section 1 of the
Sherman Act.  Even assuming that the market for the sale of
Haring artwork constitutes a valid product market, the

plaintiffs have failed to allege sufficient information about the conspiracy to give the defendants fair notice of the claim, or sufficient facts that would support the inference of interdependent, rather than independent, conduct by the alleged conspirators.

Plaintiffs describe the conspiracy, formed sometime in the early 90s, as being between "Defendants and their allies," specifically art galleries, dealers, and major auction houses who "severely restrict the supply of Haring artwork in the marketplace."  All named defendants are employees of, or associated with, the Foundation.  The only "ally" identified by name is Deitch, an art dealer who sold two Harings at a Sotheby's auction in 2014.  Under the theory advanced in the Complaint, any refusal by an auction house, dealer, or gallery to sell a Haring without authentication by the Foundation could be a conspiratorial act.  Such broad allegations do not give the defendants fair notice of the claim against them.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50-52 (2d Cir. 2007).

Furthermore, the Complaint's allegations regarding the refusals of auction houses and others to accept plaintiffs' works can be explained by unilateral decisions motivated by entirely lawful goals.  The decision by any individual entity not to sell artwork that may not be authentic is an act

12

consistent with lawful, independent action.  "[A]lleging parallel conduct alone is insufficient, even at the pleading stage."  <u>Mayor & City Council of Baltimore, Md.</u>, 709 F.3d at 136.  After all, an art dealer may be liable under the law if it sells counterfeit work.  <u>See, e.g.</u>, N.Y. Arts & Cult. Aff. Law § 13.01; U.C.C. § 2-313.

Moreover, the Complaint admits that a market for unauthenticated work exists, albeit at reduced prices. Furthermore, the Complaint does not assert that the defendants provide the only means to obtain authentication of Haring works. That the Foundation is the sole source of the <u>Foundation's</u> authentication certificate is stating the obvious and does not bridge this gap.

In support of their claim, the plaintiffs emphasize the refusals to deal by Sotheby's and Gagosian Gallery after initial expressions of interest.  The plaintiffs contend that this supports an inference of illegal collusion since it is against an art dealer's self-interest to refuse to sell artwork it believes is authentic.  A refusal to sell, however, is consistent with both independent and interdependent conduct as the decision to sell artwork turns on an assessment of a number of factors.  Moreover, the plaintiffs have not stated in a non-conclusory fashion any facts indicating what benefit the auction

houses derive from participating in a group boycott of works they believe to be authentic but that have not been authenticated by the Foundation.[8]  At its core, the Complaint asserts that auction houses and other sellers of art do not sell Haring works without the Foundation's approval because they fear legal retribution from the Foundation.  This is an argument for monopolization, not conspiracy, and is addressed below.

Plaintiffs attempt to save the Section 1 claim by arguing that the Complaint sufficiently alleges an intra-enterprise conspiracy within the Foundation because some directors, as owners of Haring artwork, have a personal interest in restraining the market for Haring works.  Plaintiffs have also suggested that defendants Stark and Gruen, who are compensated by the Foundation, have independent economic interests in the conspiracy.  This argument lacks merit.

Generally, a Section 1 claim requires concerted action between separate legal entities.  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984).  In some

---

[8] Plaintiffs make a single, general allegation that unnamed co-conspirators benefit from their participation in the boycott by being permitted to exhibit and display the Foundation's own collection.  But, as plaintiffs acknowledge in the Complaint, they own $40 million worth of Haring artwork, and the Foundation only owns $25 million.  It is not a credible inference that co-conspirators would forego the benefits of selling the plaintiffs' art solely for the privilege of selling the Foundation's.

instances, a conspiracy may exist among persons within a single organization when it joins together "separate economic actors pursuing separate economic interests such that the agreement deprives the marketplace of independent centers of decisionmaking and therefore of a diversity of entrepreneurial interests and thus of actual or potential competition." Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 195 (2010) (citation omitted).  American Needle directs courts to look at the "competitive reality" rather than the legal organization to determine if a conspiracy may exist within one legal entity. Id. at 196.

The participation in the Foundation of three or more directors alleged to own Haring artwork does not "deprive the marketplace of independent centers of decisionmaking" in any sense.  There is no allegation that these directors are art dealers or play a role akin to the other institutions alleged to be co-conspirators with the Foundation.  The directors named as owners of Haring works acquired their artwork as bequests in Haring's will.

Nor is there any basis for asserting that, because some defendants are compensated by the Foundation, these defendants are separate competitors in the market for the sale of Haring art.  The mere fact that a director is paid does not make a

15

director a separate competitor in the market, even if the
compensation gives the director an interest in perpetuating
anticompetitive conduct.

In opposition to the defendants' motion to dismiss, the
plaintiffs primarily rely on Allied Tube & Conduit Corp. v.
Indian Head, Inc., 486 U.S. 492 (1988), and Simon-Whelan v. Andy
Warhol Found. for the Visual Arts, Inc., 07cv6423(LTS), 2009 WL
1457177 (S.D.N.Y. May 26, 2009).  Plaintiffs cite Allied Tube
for the general proposition that "standard-setting"
organizations are ripe for antitrust abuse, and argue that the
Foundation is a "standard-setting" organization that has abused
its authority.  Reliance on Allied Tube is misplaced.  The
Foundation is not a standard-setting authority.  It does not
purport to create industry standards for competitors in the
market.  Allied Tube, 486 U.S. at 500.  In any event, the
existence of standard-setting authority does not create a free-
standing antitrust claim absent a Section 1 conspiracy or
Section 2 monopoly.  See id. at 509.

Simon-Whelan, though not binding on this Court, also arises
from a dispute in the art world.  Despite this surface
similarity, however, reliance on Simon-Whelan in inapt.  There,
the Andy Warhol Foundation for the Visual Arts ("Warhol
Foundation") was alleged to have conspired with the Andy Warhol

16

Authentication Board ("Board") to restrain the market for Andy Warhol ("Warhol") artwork. Simon-Whelan, 2009 WL 1457177, at *2. The plaintiff in Simon-Whelan alleged a conspiracy between the Warhol Foundation, which published a catalogue raisonné[9] of Warhol's work, and the Board, which authenticated or declined to authenticate submitted works. Id. By controlling both the catalogue raisonné and the Board, the defendants were alleged to exercise complete control over the authentication of Warhol's work, which they used to create scarcity in the market for Warhol's work.

Since the factual context in the two cases are so dissimilar, the Simon-Whelan legal analysis provides little guidance here. No catalogue raisonné exists for Haring's works, and the plaintiffs here do not premise their claim on an agreement between the Foundation and the Committee, but on an agreement between the Foundation and art dealers, auction houses, and galleries. As significantly, the defendants here ceased their authentication activities in 2012 and could not be plausibly alleged to control authentication of Haring's work. The Section 1 claim and corresponding claim under the Donnelly Act are dismissed.

---

[9] A catalogue raisonné is a comprehensive, scholarly compilation of an artist's known body of work.

**B. Monopolization**

Plaintiffs also bring a claim under Section 2 of the Sherman Act.  To state a claim for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Pepsico, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1996)) (summary judgment decision); see also Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 61 (2d Cir. 1997).

"The core element of a monopolization claim is market power, which is defined as the ability to raise price by restricting output." Pepsico, 315 F.3d at 107 (citation omitted).  To prove a monopolization claim, plaintiffs may demonstrate market power in one of two ways: either through direct evidence that the defendant can control prices or exclude competition, or through defendants' share of the relevant market.  Tops Market, Inc. v. Quality Markets, Inc., 142 F.3d 90, 98 (2d Cir. 1998).  The possession of a copyright interest in property is a "limited grant of monopoly privileges." Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,

18

508 U.S. 49, 64 (1993) (citation omitted).  The holder of intellectual property rights may enforce these rights, even in circumstances where it is not clear that conduct is actually infringing.  Id. at 65.

Plaintiffs have defined the relevant market for their Section 2 claim as the worldwide market for the sale of Haring works.  Plaintiffs do not allege any facts regarding the defendants' market share or even that the defendants have participated in the market more recently than 2011.  Rather, the Complaint essentially claims that the Foundation continues to act as an informal market regulator by threatening or initiating pretexual lawsuits to preclude authentic Haring works from being exhibited or sold.  Plaintiffs contend that the defendants, as the final standard-setting authority in the authentication market and the owner of "virtually all intellectual property rights relating to Keith Haring," are able to exclude any given Haring work from the relevant market through the use of lawsuits to enforce its intellectual property rights.

Assuming that the market for the sale of Haring works constitutes a valid submarket in the art market, the plaintiffs have failed to plausibly allege a claim under Section 2.  The Complaint does not provide any factual basis for the contention that the defendants possess monopoly power in the relevant

market.  Plaintiffs do not allege that defendants have
participated in the market more recently than 2011, and allege
no facts regarding the defendants' market share.  The Committee
was dissolved in 2012 and no longer offers authentication
services.  As the Complaint acknowledges, there are others in
the art world that provided authentication services in the past
and that do so today.

The only fact alleged in support of the claim that the
defendants have monopoly power is that defendants possess
intellectual property rights in Haring works, and the defendants
initiate lawsuits asserting those rights.  Even assuming that
some of these lawsuits were brought in bad faith, this does not
establish unlawful monopoly power.  "Regardless of whether [a
copyright holder] intended any monopolistic or predatory use,
[it] acquired this [copy]right . . . [and] to condition a
copyright upon a demonstrated lack of anticompetitive intent
would upset the notion of copyright as a limited grant of
monopoly privileges."  Id. at 64 (citation omitted).

In opposition to the motion to dismiss, the plaintiffs
essentially abandon their Section 2 claim.[10]  The failure to
allege facts to suggest that the defendants possess unlawful
monopoly power requires dismissal of the Section 2 claim and

---

[10] Plaintiffs make only one reference -- in a footnote -- to the
Section 2 claim.

corresponding claim under the Donnelly Act.

## II. The Lanham Act Claim

Plaintiffs also bring a claim under the Lanham Act, 15 U.S.C. § 1125, on the theory that the Miami Complaint and Press Release constitute false advertising.  The Lanham Act provides:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . <u>in commercial advertising or promotion</u>, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, <u>or commercial activities</u> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added).  To constitute commercial advertising or promotion under the Lanham Act, a statement must be: "(1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." <u>Gmurzynska v. Hutton</u>, 355 F.3d 206, 210 (2d Cir. 2004) (citation omitted).  Core commercial speech is "speech which does no more than propose a commercial transaction." <u>City of Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410, 422 (1993) (citation omitted).  In some instances,

"commercial speech" may also include "expression related solely to the economic interests of the speaker and its audience."  Id. (citation omitted).

Plaintiffs have failed to plead a claim under the Lanham Act.  Plaintiffs allege that the Press Release and Miami Complaint were commercial in nature because they were published "with the intent of preventing sales of the [the plaintiffs'] works . . . and of increasing the value of Defendants' artworks at their expense." (Emphasis added.)  This fails to allege a sufficient connection between either the Press Release or Miami Complaint and a proposed commercial transaction and thus fails to allege the essential elements of a Lanham Act violation.[11] The plaintiffs' claims under the Lanham Act are dismissed.

**III. State Law Claims**

Plaintiffs have also brought six separate tort claims under New York law stemming from the defendants' filing of the Miami Complaint and the issuance of the Press Release.  Where no federal claims remain in an action, and diversity jurisdiction is lacking, a district court is not required to retain jurisdiction of remaining state law claims.  28 U.S.C. § 1367(c)(3); Rocco v. New York State Teamsters Conference Pension

---

[11] The parties dispute whether a pleading could ever be considered commercial speech.  It is unnecessary to reach this issue in order to resolve this motion.

& Retirement Fund, 281 F.3d 62, 72 (2d Cir. 2002).  A district court may, however, "at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction."  Parker v. Della Rocco, 252 F.3d 663, 666 (2d Cir. 2001) (citation omitted).  The court must "consider and weigh in each case, at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity" in order to decide whether to exercise jurisdiction over pendent claims.  Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 445 (2d Cir. 1998); see also Mauro v. Southern New England Telecomm., Inc., 208 F.3d 384, 388 (2d Cir. 2000).

On balance, these factors weigh in favor of exercising supplemental jurisdiction over the plaintiffs' state law claims. While the federal claims have been dismissed and this motion is brought at an early stage in the litigation, the state law claims may be resolved without considering any novel or complex questions of state law.  Convenience and judicial economy weigh heavily in favor of resolving these straightforward tort claims as part of this motion.  Thus, the Court will exercise supplemental jurisdiction over the plaintiffs' remaining state law claims.  The defendants' motion to dismiss as to the plaintiffs' tort claims is granted.

23

## A. Privilege

Defendants contend that the plaintiffs' state law claims are entirely barred by the absolute privilege afforded to statements made during judicial proceedings and the statutory privilege accorded to anyone who makes a "fair report" of a lawsuit.  Under New York law, statements made in the course of legal proceedings are absolutely privileged if pertinent to the litigation.  Kelly v. Albarino, 485 F.3d 664, 666 (2d Cir. 2007) (citation omitted) (applying New York law).  This privilege is not lost even in the presence of actual malice.  Id. Furthermore, while statements must be pertinent to the litigation to be privileged, "this is the broadest of possible privileges and any matter which, by any possibility, under any circumstances, at any stage of the proceeding, may be or may become material or pertinent is protected by an absolute privilege even though such matter may be ineffectual as a defense."  Id.

The statements in the Miami Complaint are privileged.  The core issue in the Miami litigation was whether the organizers of the Miami Exhibition falsely claimed that the displayed works were created by Haring, thereby infringing on the Foundation's intellectual property rights.  The statements in the Miami Complaint alleged to be tortious -- namely, statements

24

describing the plaintiffs' works as fakes or counterfeits -- are directly relevant to that central dispute.  The statements in the Miami Complaint are therefore privileged and may not be the basis for a tort claim.

The statements in the Press Release, however, are not privileged.  New York law provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding . . . ."  N.Y. Civ. Rights Law § 74.  Whether or not the fair reporting privilege applies requires a determination of whether or not the report is "substantially accurate."  Karedes v. Ackerley Grp., 423 F.3d 107, 119 (2d Cir. 2005) (citation omitted).  Application of the fair reporting privilege is inappropriate at the motion to dismiss stage if a reasonable jury could conclude that the report "suggest[ed] more serious conduct than that actually suggested in the" judicial proceeding.  Id. (citation omitted).

The Press Release characterized the Agreement between the parties as an agreement to remove "fake" Haring works.[12]  The Agreement, however, does not contain any admission by the organizers of the Miami Exhibition that the removed works were

---

[12] The Miami litigation was later settled on February 28, 2014, through a stipulation of dismissal.  This stipulation did not contain any agreement about the authenticity of the works displayed at the Miami Exhibition.

inauthentic, and proffers no reason for the removal of the disputed works.  Accordingly, a reasonable jury could find that the Press Release stated that the parties had agreed that the works were inauthentic, a conclusion not warranted by the terms of the Agreement.  For the purposes of this motion, it is therefore assumed that the fair reporting privilege does not apply to statements made in the Press Release.[13]

## B. Defamation and Conspiracy to Defame

Defamation or libel require a plaintiff to show: "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability."  Chau v. Lewis, 771 F.3d 118, 126-27 (2d Cir. 2014) (citation omitted) (applying New York law).  "A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement . . . .  If the statement is

--------

[13] Plaintiffs also contend that the Williams exception to the fair reporting privilege applies.  Williams v. Williams, 23 N.Y.2d 592, 599 (1969).  In Williams, the New York Court of Appeals established an exception to the statutory fair reporting privilege that applies when a person maliciously institutes a judicial proceeding alleging false and defamatory charges, and then circulates a press release or other communication based on the judicial proceeding.  Id.  Plaintiffs suggest that if the Williams exception applies, it would permit tort claims against defendants for statements made in the judicial proceedings themselves.  Even assuming that the Williams exception applies, it is an exception to the statutory fair reporting privilege, not the absolute privilege afforded to statements made in judicial proceedings.

susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory." Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 178 (2d Cir. 2000) (citation omitted) (applying New York law).

New York law distinguishes between defamation of a person and defamation of a product. Ruder & Finn Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 670-71 (1981).  The bare accusation that a product does not conform to its advertised quality does not, without more, defame the owner of the product.

> Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies . . . .  Where, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for disparagement, but will do so only if [the additional elements for trade libel] are proven.

Id. at 670-71; see also El Meson Espanol v. NYM Corp., 521 F.2d 737, 739-40 (2d Cir. 1975) (applying New York law and finding that an article stating that a restaurant was a good place to meet for drug deals did not defame the owner, when it did not state that the owner knew or participated in the illegal activity); Harwood Pharmacal Co. v. Nat'l Broad. Co., 9 N.Y.2d 460, 462-63 (1961) (noting that mere disparagement of the quality of a product does not defame the owner but statement that the plaintiff's product was "full of habit-forming drugs" and would require "a hospital cure to stop" defamed the owner

27

because it accused him of putting an "unwholesome and dangerous" product on the market (citation omitted)); Drug Research Corp. v. Curtis Pub. Co., 7 N.Y.2d 435, 440 (1960) (holding that article concerning the deceptive business activities of a corporation did not defame the integrity and business methods of the owner).

Even viewing the Press Release in the context of the Miami litigation, the plaintiffs have failed to allege sufficient facts that would allow a reasonable jury to conclude that the Press Release concerns them.  The Press Release specifically states that the lawsuit is against the organizers of the Miami Exhibition.  The Press Release also describes the lawsuit as an "effort to stop the display of fake Haring works at the exhibition," and the stipulation as an agreement "to remove all fake Haring works from the exhibition immediately and to destroy the offending catalogue that illustrated most of the fake works."  No plaintiff is named as a defendant in the Miami litigation, and only Bilinski is mentioned by name in the Miami Complaint.  The Miami Complaint was not disseminated with the Press Release.  Assuming arguendo that the statements in the Press Release are defamatory, they are defamatory only in that they accuse the organizers -- not the owners of Haring works -- of misconduct.  To the extent that the plaintiffs are referenced

28

by implication, the disparagement only relates to their property and thus cannot constitute the basis for defamation.  El Meson Espanol, 521 F.2d at 739-40.

Relying on Kelly v. Schmidberger, 806 F.2d 44 (2d Cir. 1986), the plaintiffs argue that the Press Release defames them personally, rather than their property.  In Kelly, a statement that the plaintiffs had placed church property "in their own names" sufficiently concerned the plaintiffs rather than their property.  Id. at 48.  That statement, however, addresses the plaintiffs' actions rather than the nature and quality of the property.  In contrast, the statements at issue in the Press Release concern the quality of property.  Because the plaintiffs have failed to demonstrate that the Press Release concerned them, it is unnecessary to resolve the parties' disputes over the other elements of a defamation claim and whether the Complaint adequately pleads those elements.  The claims for defamation and conspiracy to commit defamation are dismissed.[14]

**C. Tortious Interference with Business Relationships**

The plaintiffs assert that the Miami litigation and Press Release tortiously interfered with a sale of Haring art by one of the plaintiffs to a London buyer.  To prevail on a tortious

---

[14] New York law does not recognize an independent tort of conspiracy.  Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006).

interference with business relations claim, a plaintiff must
demonstrate that: (1) it had a business relationship with a
third party; (2) the defendant knew of that relationship and
intentionally interfered with it; (3) the defendant acted solely
out of malice, or used dishonest, unfair, or improper means; and
(4) the defendant's interference caused injury to the
relationship. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir.
2003) (New York law); see also 534 E. 11th St. Hous. Dev. Fund
Corp. v. Hendrick, 935 N.Y.S.2d 23, 24 (App. Div. 2011)
(requiring the defendant to have knowledge of the business
relationship); Amaranth LLC v. J.P. Morgan Chase & Co., 888
N.Y.S.2d 489, 494 (App. Div. 2009) (same); Caprer v. Nussbaum,
825 N.Y.S.2d 55, 78 (App. Div. 2006) (same).

    This claim must be dismissed since the Complaint does not
identify the London buyer or allege that the defendants knew of
the business relationship at the time they filed their lawsuit
or issued the Press Release. Brill Physical Therapy, P.C. v.
Leaf, 2011 N.Y. Slip Op. 33903(U) (Sup. Ct. Aug. 4, 2011), cited
by the plaintiffs in support of their tortious interference
claim, stands at most for the proposition that a plaintiffs need
not identify the name of the buyer in this pleading.  It does
not excuse the plaintiff from pleading that the defendants
actually knew of the business relationship.  The tortious

interference with business relations claim is dismissed.

**D. Trade Libel**

Defamation of a product or good,[15] rather than a person,
constitutes a distinct cause of action under New York law.
Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314
F.3d 48, 59 (2d Cir. 2002) (citing Ruder & Finn, 52 N.Y.2d at
670-71).  "To recover for disparagement of goods, the plaintiff
must show that the defendant published a[] . . . defamatory
statement directed at the quality of a business's goods and must
prove that the statements caused special damages."  Id.
Generally, special damages means "the loss of something having
economic or pecuniary value."  Albert v. Loksen, 239 F.3d 256,
271 (2d Cir. 2001) (citation omitted).  "Where loss of customers
constitutes the alleged special damages, the individuals who
ceased to be customers, or who refused to purchase, must be
named and the exact damages itemized."  Fashion Boutique, 314
F.3d at 59 (citation omitted) (New York law).  Pleading damages
as a round number with no attempt at itemization alleges general
rather than special damages.  Drug Research Corp., 7 N.Y.2d at
441-42.

Assuming that the plaintiffs have sufficiently alleged that
the statements in the Press Release defamed their goods, the

---

[15] This tort is described interchangeably as trade libel,
injurious falsehood, and product disparagement.

plaintiffs have failed to allege special damages.  The Complaint
only attempts to itemize damages for one plaintiff, alleging
that Canario "lost the sale of artwork" to a London museum as a
result of the Miami litigation, but does not name the museum or
the sales price.  As special damages are an element of a trade
libel claim, the failure to allege special damages is fatal to
the claim.  Defendants' motion to dismiss is granted as to the
claim of trade libel.

Plaintiffs argue that they have alleged special damages
because the requirement that the lost customers be identified
may be relaxed when disparaging comments are disseminated widely
and the nature of the plaintiffs' business prevents the
identification of lost customers.  This argument lacks merit.
None of the authorities cited by plaintiffs excuse their failure
to identify the amount of lost sales in connection with the sale
to the London museum.  Moreover, of the two cases cited by the
plaintiffs in support of this argument, one was reversed on
appeal as the plaintiffs had <u>failed</u> to plead special damages by
not identifying lost customers or sales amounts.  <u>Prince v. Fox
Tel. Stas., Inc.</u>, 941 N.Y.S.2d 488, 488 (App. Div. 2012)
("Plaintiffs' product disparagement claim should have been
dismissed to the extent it seeks damages in connection with lost
customers, as Plaintiffs failed to plead such special damages

with the requisite specificity.").  <u>Charles Atlas, Ltd. v. Time-Life Books, Inc.</u>, 570 F. Supp. 150 (S.D.N.Y. 1983), the other case cited by the plaintiffs, predates <u>Prince</u> and is also factually distinguishable as the plaintiff was able to identify an exact number of lost sales even if the identities of the would-be purchasers were unknown.  <u>Id.</u> at 155-56.

**E. Intentional Infliction of Economic Harm/Prima Facie Tort**

"Under New York law there are four elements to a prima facie business tort claim: (1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful."  <u>U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.</u>, 95 F.3d 153, 161 (2d Cir. 1996).  As the plaintiffs have failed to plead special damages, the prima facie tort claim is dismissed.

**F. Unjust Enrichment**

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  <u>Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 306 (2d Cir. 2004).  The benefit acquired by the defendant must be "specific" and directly related to the loss

33

suffered by the plaintiff.  <u>Kaye v. Grossman</u>, 202 F.3d 611, 616
(2d Cir. 2000) (reversing a jury verdict where benefit acquired
by the defendant was indirectly related to plaintiff's loss).

Plaintiffs allege that the defendants were enriched because
the value of their own Haring works was increased by preventing
others from selling works.  Plaintiffs also allege that Stark
and Gruen were enriched through the salaries and fees paid by
the Foundation.  These facts fail to plead a claim for unjust
enrichment.  The benefit acquired by the Foundation -- the
alleged increase in value of Haring works owned by the
Foundation -- is not a benefit flowing directly to the
defendants at plaintiffs' expense.  Rather, it is an indirect
and hypothetical benefit.  Also, the connection between the
alleged harm to the plaintiffs and the compensation paid to
individual defendants is too attenuated to support an unjust
enrichment claim.  Plaintiffs' claim for unjust enrichment is
dismissed.[16]

---

[16] Because all tort claims have been dismissed, the defendants'
argument that claims against uncompensated directors are barred
as a matter of law need not be considered.

**CONCLUSION**

Defendants' August 29 motion to dismiss is granted.  The Clerk of Court shall close the case.  A separate order addresses the defendants' motion for sanctions.


Dated:    New York, New York
          March 6, 2015

                              _____
                                   DENISE COTE
                              United States District Judge

35